634 A.2d 90

CLIENTS' SECURITY FUND OF THE BAR OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. SECURITY TITLE AND GUARANTY COMPANY, DEFENDANT–APPELLANT, AND ALLIANCE TITLE AGENCY, CENTER SAVINGS & LOAN ASSOCIATION; AND JOSEPH WITKOWSKI, DEFENDANTS, AND SOUTHERN MORTGAGE ASSOCIATES, INC., DEFENDANT–RESPONDENT.

SECURITY TITLE AND GUARANTY COMPANY, PLAINTIFF–APPELLANT, v. DOUGLAS C. HART, DEFENDANT–RESPONDENT, AND DIANE CHAPIN AND SUSAN HARRISON, DEFENDANTS.

Argued March 15, 1993—Decided July 29, 1993.

*George J. Lasky* argued the cause for appellant (*Lasky and Cohen,* attorneys).

*Daniel R. Hendi,* Deputy Counsel, argued the cause for respondent New Jersey Lawyers' Fund for Client Protection (*Kenneth J. Bossong,* Counsel, attorney).

*Louis J. Casagrande* argued the cause for respondent Douglas C. Hart (*Monte & Marriott,* attorneys).

*Jack A. Serpico* argued the cause for respondent Southern Mortgage Associates, Inc.

*John.R. Weigel* submitted a brief on behalf of *amicus curiae,* New Jersey Land Title Association.

The opinion of the Court was delivered by

HANDLER, J.

In the companion case, *Sears Mortgage Corporation v. Rose and Kaiser,* 134 *N.J.* 326, 634 *A.*2d 74 (1993), decided today, we considered the issue of which party participating in the closing of a real estate title must ultimately absorb the loss caused by the closing attorney's theft of moneys earmarked for the payment of an existing first mortgage on the property. In that case, aside from the seller, the only parties involved in the real-estate closing were the purchaser and the title-insurance carrier. We held that under the circumstances the closing attorney, although retained by the buyer, was the agent of the title-insurance carrier, and therefore the carrier, not the purchaser, was liable for the loss occasioned by the attorney's embezzlement. We also held the carrier liable for the loss because protection against the risk of

attorney defalcation was implicit in the duty of good faith and fair dealing owed by the insurer to the purchaser and was an incident of the title insurance provided to the purchaser.

In this case, the real-estate closing involved the refinancing and replacement of a first mortgage on property. The funds were furnished by a third-party lender to be secured by a first mortgage. The attorney who embezzled those funds was retained by the owner of the property (referred to throughout as the "purchaser" or "buyer"). As a result of that theft, the existing mortgage was not paid. Hence, we must directly address the status of the lender-mortgagee in determining which party—the purchaser, the title insurer, or the third-party lender—should bear the loss of the closing attorney's embezzlement. Further, we must also determine whether attorneys' fees may be awarded if the title-insurance carrier is found to be responsible for the loss.

In addition, the purchaser in this case, confronted with the loss caused by his attorney's theft, filed a claim with the Clients' Security Fund. The Fund paid the purchaser only a portion of the loss attributable to his attorney's misappropriation. We therefore consider the responsibility of the Fund in dealing with claims based on such losses.

I

In 1985, Douglas Hart purchased a condominium in Eatontown from its builder for $95,000. He financed the purchase with a $90,000 mortgage to Center Savings and Loan ("Center"). Hart retained Joseph Witkowski, a Rahway lawyer referred to him by a colleague, to represent him in the purchase.

Witkowski ordered and received a title report on the Eatontown property from Alliance Title Agency ("Alliance"), the local agent for Security Title and Guaranty Company ("Security"). At the closing, Hart gave Witkowski $526 to cover the title-insurance premium. Witkowski explained to Hart that title insurance would protect him against any claims made against the property. Witkowski, however, never sent the $526 to Alliance, and a title policy

never issued. Alliance did not communicate with Hart to ask why the premium had not been paid or to ask him if he wanted to cancel the policy. Hart received copies of his recorded deed and the loan documents and began making his monthly mortgage payments to Center.

In 1986, when interest rates fell, Hart decided to refinance his Center mortgage. He applied to Southern Mortgage Associates ("SMA") and was approved for a $91,000 loan. Hart retained Witkowski to represent him in closing the SMA mortgage. The SMA commitment for a $91,000 loan to Hart, which issued in May 1986, provided that Witkowski would close the loan for SMA in compliance with SMA's closing instructions. SMA required as a condition of the loan that Witkowski obtain title insurance and that the Center mortgage loan be paid off at the closing and cancelled.

Witkowski ordered a title report and commitment from Alliance. Alliance's May 15, 1986, commitment to issue a loan policy for $91,000 required that Hart pay off and cancel the Center mortgage. The title commitment listed SMA as the proposed insured. On May 27, 1986, Alliance sent Witkowski a bill for $522 to cover the policy premium.

As was its custom, SMA also required a "closing-protection letter" from the title-insurance company. The letter protected SMA against the risk of loss resulting from the fraud or theft of the buyer's closing attorney, who was designated as the title company's "approved attorney" for the purposes of the closing. Alliance did not charge SMA for the protection afforded through the letter; rather, the cost of that protection was built into the insurance premium charged and paid for by Hart. Security issued the letter.

Shortly before the closing date, June 13, 1986, SMA sent Witkowski the closing package, which included a note, the mortgage, the net check for the refinancing, and SMA's closing instructions. The check for $91,000 was made payable to Witkowski and

Hart jointly. The closing instructions, which were directed to Witkowski, began:

> The following are closing instructions which you, as our closing agent, must comply with as checked. *Do not disburse any loan proceeds without full compliance with these instructions.*

The instructions required, among other things, that Witkowski pay off the Center mortgage.

At the closing, Witkowski had Hart endorse the check. Witkowski signed a copy of the closing instructions and returned it to SMA along with copies of all the documents executed at the closing. Included was his signed "Attorney's Certification," on a form furnished by SMA, in which he certified that SMA's $91,000 loan was secured by a first mortgage on Hart's property. The SMA mortgage was recorded.

The closing statement reflects a $547 charge to Hart for title insurance. On June 18, 1986, Witkowski sent a check for $522 to Security to cover the title-insurance premium. (Although the trial court concluded that Witkowski must have pocketed the $25 difference, in fact the $25 was a cancellation charge billed by Security to Witkowski directly and unbeknownst to Hart.) A year and a half after Witkowski's application to Security for title insurance, when Security was beginning to prepare a title binder for the refinancing, it noticed that no premium had been received for the original purchase and that no policy had been issued to either Center or Hart. Security billed Hart, through Witkowski, for cancelling the original policy without checking with Hart on whether he wanted to cancel the policy, and then issued a new commitment for a loan policy, with SMA as the proposed insured. Security deposited Hart's check for the premium on the loan policy but did not issue a policy because it was never informed that the Center mortgage had been paid off and cancelled. It was never so informed because instead of paying off the Center mortgage, Witkowski stole the $91,000.

Hart began making regular monthly payments on the SMA mortgage and stopped making payments to Center, because he

assumed that the loan had been repaid in full. When Hart received delinquency notices from Center, investigation revealed Witkowski's theft. Witkowski was prosecuted, convicted, sentenced, and disbarred for this and other similar defalcations.

SMA called on Security to fulfill its obligation under the closing-protection letter. Security did so in September 1987 by paying Center the amount due on its mortgage, $107,800, taking an assignment of the mortgage and subordinating it to the SMA mortgage. Security then demanded that Hart reimburse it for the Center mortgage. Hart, who was paying off the SMA mortgage, refused to reimburse Security for the Center mortgage.

In December 1987, Hart filed a claim with the Clients' Security Fund of the Bar of New Jersey, now called the New Jersey Lawyers' Fund for Client Protection ("Fund"). The Fund, which was created to reimburse clients for losses caused by the dishonest conduct of members of the bar of New Jersey, denied the claim because it concluded that Hart had a collateral source of recovery, namely, Security and SMA. See *Rule* 1:28–3(b)(5). However, the Fund set aside $50,000 in case a claim could later be substantiated. Although Hart's claimed loss was $91,000, the Fund's cap for individual claimants in 1986, when the loss occurred, was $50,000.

On October 20, 1988, Security, owner of the Center mortgage, filed a foreclosure complaint in the Chancery Division against Hart. Hart answered, counterclaimed against Security, and filed a third-party complaint against Witkowski.

In October 1989, while the foreclosure action was pending, Hart sold the Eatontown property because of a pending job transfer. The SMA mortgage was paid off and the remaining equity, $42,000, which normally would have been turned over to Hart, was put into escrow. The Fund paid half of the escrow, $20,986, to Hart in November 1989, and Hart assigned half of his interest in the escrow proceeds to the Fund. The Fund then brought its own action against Security in June 1989, naming as defendants Securi-

ty, Alliance, SMA, Center, and Witkowski. SMA cross-claimed against Security.

The trial court consolidated Security's foreclosure action and the Fund's action, and granted Center's and Alliance's motions for summary judgment. In January 1990, the court stayed the foreclosure action pending disposition of the case.

Based on the explicit closing instructions that SMA had given Witkowski, the trial court found that Witkowski was not only Hart's agent but also SMA's agent for the limited purpose of the closing. The court, however, found that Witkowski, simply because of his designation as the title company's "approved attorney," was not Security's agent. It also determined that the money stolen belonged to Hart and thus Hart was responsible for the loss because his agent had embezzled the funds in violation of the conditions imposed by SMA. Therefore, the court held that Security could foreclose against Hart and was entitled to the $42,000 in escrow. It also awarded $7,300 in attorneys' fees to SMA and against Security.

The Appellate Division reversed, 257 *N.J.Super.* 18, 29, 607 *A.*2d 1319 (1992). It held that Witkowski had been SMA's agent for the closing and that the money stolen belonged to SMA, not to Hart. The court also stated that by designating Witkowski as its agent and putting him in a position that enabled him to steal the closing proceeds, SMA was liable for the lawyer's fraud. The Appellate Division further determined that Security was ultimately liable for the loss based on the closing-protection letter it had provided SMA. Consequently, it ruled that Security could not foreclose the Center mortgage against Hart, but rather was obligated to satisfy and discharge that mortgage and make SMA's lien fully enforceable against Hart. The court also affirmed the award of attorney's fees to SMA and against Security, and ordered the trial court to disburse the escrow funds in accordance with the agreement between the Fund and Hart.

This court granted Security's petition for certification, 130 *N.J.* 598, 617 *A.*2d 1220 (1992).

## II

We consider initially the issue of who, as between the purchaser and the title-insurance carrier, should bear the loss occasioned by the theft of funds by the purchaser's closing attorney. We may thereafter consider the effect of that determination on whether, ultimately, that party or the third-party lender should be liable for the loss.

In the companion case, *Sears Mortgage Corporation, supra*, 134 *N.J.* 326, 634 *A.*2d 74 (*"Sears"*), we determined that a closing attorney who had been retained by the purchaser and designated by the title insurance company as its approved attorney to effectuate the purchase of insurance was a dual agent of both the buyer and the title insurer. *Id.* at 346, 634 *A.*2d at 84. We held that responsibility for the attorney's theft of the purchase moneys should be placed on the insurer because, as between both principals, the insurer exercised greater control over the attorney and was in a better position to have avoided the loss. *Id.* at 346, 634 *A.*2d at 83.

For the reasons that persuaded us in *Sears* that the closing attorney was the agent of the insurer, we find in this case such an agency relationship. Thus, the elements that give rise to an agency relationship—the authorization to the agent to perform functions on behalf of the principal, the agent's manifestation of consent to the agency, the ability to control the agent, and the third party's reliance on the agent's apparent authority to act for the principal—are present here to establish an agency relationship between Witkowski and Security. *See Sears, supra*, 134 *N.J.* at 343–344, 634 *A.*2d at 82–83.

In addition, Security was aware of the risk of attorney defalcation. That is evidenced by the widespread practice of issuing closing-protection letters to third-party lenders. See discussion *infra* at 370–371, 634 *A.*2d at 95–96; *Sears, supra*, 134 *N.J.* at 350, 634 *A.*2d at 85–86. Moreover, Security should have been alerted to the risk in this case. In 1985, Hart ordered and paid $526 for

title insurance on the condominium he was purchasing. When Witkowski failed to forward the premium payment to Alliance, the title company did not communicate with its proposed insured, Hart, to inquire about the premium, to inform him that he would not be insured until the payment had been received, or to ask him whether he wanted the commitment cancelled. Rather, a year and a half later, when Witkowski applied for a loan policy for the same property on behalf of SMA, it sent a bill to Witkowski for the new premium as well as a cancellation charge for the old policy, which had never gone into effect. Thus, Security was in a position to recognize that something unusual had occurred with respect to Hart's original title-policy application, yet it did nothing to investigate the matter or to inform its proposed insured that he was not protected by title insurance.

Moreover, although Security provided SMA protection against attorney defalcation without cost other than the premium paid by Hart, Security neither offered that protection to Hart nor informed Hart that the risk of attorney defalcation was his to bear. Though in a superior position to confront the risk of attorney defalcation, the insurer left Hart defenseless to avoid the loss.

Thus, as between Security and Hart, we are satisfied that Security should bear the loss attributable to Witkowski's theft. The further question is whether that responsibility may be cast on another party, the third-party lender.

## III

Security properly recognized its obligation, under the closing-protection letter, to indemnify SMA for the loss attributable to Witkowski's theft. The closing-protection letter, referred to as a "Closing Protection Letter for Joseph R. Witkowski, Esquire," provided in pertinent part that Security

> hereby agrees to reimburse you [SMA] for actual loss incurred by you in connection with such closings when conducted by an Issuing Agent (an agent authorized to issue title insurance for the Company) or an Approved Attorney (an attorney upon whose certification of title the Company issues title insurance) and when such loss arises out of:

1. Failure of the Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status or lien, or (b) the obtaining of any other documents, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other documents, or (c) the collection and payment of funds due you, or

2. Fraud or dishonesty of the Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing.

Security reimbursed SMA for the loss by paying off the existing mortgage on the property. It then became, under the terms of the closing-protection letter, "subrogated to all rights and remedies which [SMA] would have had against [Hart]." Security argues that on payment of the loss and its subrogation to SMA's "rights and remedies," it became entitled to recoup its loss from Hart because SMA would have had the identical right of recovery.

We are satisfied that Security was liable to SMA for the loss attributable to the attorney's theft and that Security should not be able to pass that loss back to Hart. Two reasons support that result. Security owed Hart an independent obligation, arising out of its duty as a title insurer, to indemnify Hart as its putative insured for the loss incurred through Witkowski's theft. Second, although Security, as a subrogee, succeeded to the rights of SMA against Hart, its claim against Hart was no stronger than SMA's claim; and, under the circumstances, SMA did not have the right to recover from Hart the loss attributable to the closing attorney's embezzlement.

A.

Hart was entitled to the same protection against attorney defalcation that Security furnished SMA through the closing-protection letter. As we explained in *Sears*, title-insurance policies, although governed by statute in New Jersey, see *N.J.S.A.* 17:46B–1 to –62, are not ordinary contracts; rather, they are contracts of adhesion between parties who are not on equal

footing. *Sears, supra,* 134 *N.J.* at 347, 634 *A.*2d at 84. We further observed that a duty of good faith and fair dealing is implicit in an insurance contract, and that the insurer has an even greater duty than the insured to act fairly and in good faith. *Ibid.*

In determining what a policyholder's reasonable expectations are, our courts have applied an objective standard of reasonableness. *Ibid.* (citing *DiOrio v. New Jersey Mfrs. Ins. Co.,* 79 *N.J.* 257, 269, 398 *A.*2d 1274 (1979)). Although Hart paid premiums for title insurance on his property on two different occasions, he never saw a copy of either title commitment. Nevertheless, the average north Jersey purchaser of title insurance in those circumstances should be deemed reasonably to expect adequate insurance protection. *Sears, supra,* 134 *N.J.* at 348–349, 634 *A.*2d at 85.

> [O]ne can readily infer that an average person in that situation would reasonably expect that his or her attorney, who was also acting on behalf of the title-insurance carrier, would remove all the encumbrances and that the title insurance would protect against any failure resulting in a loss because an encumbrance was not removed.
>
> [*Id.* at 349, 634 *A.*2d at 85.]

Thus, even without reading his title commitment, Hart did have an expectation concerning what he was getting for the total of $1,073 he had paid in title premiums. At trial, he testified that at the closing, Witkowski had "described title insurance as something that protects me against anybody's coming in and having some kind of claim against the property." Although procuring the second policy to protect SMA was a condition of the loan, Hart thought that with the first title commitment he was getting an assurance of good title to the Eatontown property. That expectation was entirely reasonable, for even an unsophisticated consumer believes that he or she is purchasing title insurance to protect against defects of title. *See Sears, supra,* 134 *N.J.* at 349, 634 *A.*2d at 85 (citing *Sandler v. N.J. Realty Title Ins. Co.,* 36 *N.J.* 471, 478–79, 178 *A.*2d 1 (1962)).

In addition, although Security was statutorily permitted to send the title commitment directly to Witkowski, it was subject to

other statutory notice requirements that it did not meet. Security
had a statutory duty to notify Hart, as the mortgagor, of his right
to buy title insurance for himself:

> Whenever in connection with the making of a real estate purchase money
> mortgage loan upon a 1, 2, 3 or family dwelling house for a term exceeding 2 years,
> the mortgagee requires the issuance of a mortgagee policy of title insurance, *the
> company issuing the policy of title insurance shall prior to the disbursement of the
> mortgage funds cause the mortgagor to be advised in writing of the fact that a
> mortgagee title insurance policy is to be issued,* the name or names of the insured
> under said policy, and of the face amount of such policy. *Such notice shall also
> advise the mortgagor of his right and opportunity to obtain title insurance in his
> own favor if the same has not already been obtained.* [Emphasis added.]

[*N.J.S.A.* 46:10A–3.]

The statute further provides:

> At or before the closing of the mortgage loan transaction the company issuing
> the title insurance shall obtain from the mortgagor a statement in writing that he
> has received the notice required under section 1 of this act [46:10A–3].

[*N.J.S.A.* 46:10A–4.]

Thus, if Security had complied with the statutory notice require-
ments at the time of the refinancing, Hart would have been
alerted generally to his own title-insurance coverage.

■ Security argues, as did Commonwealth in *Sears,* that it
cannot insure against the risk of attorney defalcation because such
coverage would be in the nature of fidelity insurance and, as such,
is prohibited by statute. *N.J.S.A.* 17:46B–1(a). However, offering
protection against attorney theft of closing funds intended to pay
off a preexisting mortgage is an obligation implicit in title insur-
ance. *Sears, supra,* 134 *N.J.* at 351, 634 *A*.2d at 86.

■ We further emphasized in *Sears* that insurance companies
and brokers have a duty to advise insureds of their coverage
needs, especially when the insurer is aware of a particular peril.
134 *N.J.* at 349, 634 *A*.2d at 85. Even if Security sincerely
believed that it could not offer Hart protection against attorney
theft of closing funds, its duty of good faith and fair dealing

required that it at least disclose the fact that it was not offering such coverage. *Id.* at 350, 634 *A.*2d at 86.

■■ We are thus satisfied that Security had a direct obligation as a matter of good faith and fair dealing to offer Hart protection against attorney defalcation and, under the circumstances, is liable to indemnify Hart for any loss relating to such theft.

## B.

■■■ Security cannot pass the loss back to Hart by virtue of its claim as a subrogee of SMA. The bar against that claim arises from the relationship between SMA and Hart.

We noted in *Sears* that in a real-estate closing involving a third-party lender, as in this case, the attorney is also the agent of the lender. 134 *N.J.* at 343, 634 *A.*2d at 82. Both the trial and appellate courts below found that Witkowski was SMA's agent for the purpose of the refinancing closing. SMA's closing instructions to Witkowski and the trial testimony of SMA's vice-president clearly show that SMA had the ability to control Witkowski's actions. In finding that Witkowski was SMA's agent, the trial court was influenced by the testimony of SMA's executive vice-president:

Q. Are the bank's instructions intended to direct the closing attorney to do everything that is mentioned in those instructions? Is there any leeway that is given to him?

A. He must comply with what he is directed to do.

Q. Does he comply with all of the obligations?

A. Whatever he is told, whatever has been checked off that he has to do, he has to do.

Q. And what is expected to be done with that check if there is a condition on the instructions that is not met or could not be met at the time of settlement?

A. He has to call us up for clearance and a determination as to what has got to be done.

Witkowski signed a copy of the closing instructions and complied with some of them. (For example, he procured a loan policy from Security and a closing-protection letter.) Hence, he consented to the agency relationship. Finally, even though Hart did not

see a copy of the closing-protection letter or closing instructions, he relied on SMA's willingness to act entirely through Witkowski.

The Appellate Division believed that the money stolen was SMA's, not Hart's; it noted that SMA had instructed Witkowski to pay off Center's first mortgage on the property, thus Hart was never to have received the money SMA gave to Witkowski. 257 *N.J.Super.* at 29, 607 *A.*2d 1319. However, in addition to that consideration, the court determined that by designating Witkowski as its agent and putting him in a position that enabled him to steal the closing proceeds, it was liable for the lawyer's fraud. Thus, according to the court, Hart, the innocent client, could not be held liable to third parties for the misconduct of his attorney because he had not directed, consented to, or participated in Witkowski's misconduct. *Ibid.* We agree.

As the subrogee of SMA, Security's claim against Hart is no stronger than SMA's. *See Holloway v. State,* 125 *N.J.* 386, 396, 593 *A.*2d 716 (1991); *Aetna Ins. Co. v. Gilchrist Bros.,* 85 *N.J.* 550, 560–61, 428 *A.*2d 1254 (1981). Of all the principals, SMA, the lender, exercised the greatest degree of control over Witkowski and was in the best position to have avoided the loss. Thus, as between Hart and SMA, the lender should be liable for the attorney's defalcation, and so should its subrogee, Security.

## C.

We conclude that the ultimate loss in this case must be borne by the title insurer, Security. It expressly undertook to indemnify the third-party lender, SMA, for any losses arising out of the theft of funds by the buyer's attorney. It implicitly was obligated to provide or offer to provide the same protection to the purchaser. Further, as the subrogee of the third-party lender, the insurer's claims against the purchaser were no stronger than the lender's claims against the purchaser. The fact that the closing attorney was the agent of the lender for purposes of the closing and the lender exercised the greatest degree of control over the attorney with respect to the handling of the closing funds fairly puts on the

lender the responsibility for the ultimate loss arising out of the attorney's theft of those funds.

## IV

As earlier noted, Security effectively reimbursed SMA by paying the existing mortgagee, Center, the amount due on its mortgage, taking an assignment of that mortgage, and subordinating it to the SMA mortgage. Security, as the assignee of the Center mortgage, then demanded that Hart reimburse it by paying off that mortgage. Hart, who had become obligated under the SMA mortgage, refused to reimburse Security by discharging the Center mortgage. The Appellate Division ruled that Security could not foreclose the Center mortgage against Hart, but rather was obligated to satisfy that mortgage.

We concur in that disposition. It confirms that under the circumstances liability for the attorney's embezzlement ultimately must be Security's. It leaves the parties, the purchaser and the third-party lender, in the position they would have been in had the attorney not absconded with the closing moneys.

In addition, other issues implicating ancillary remedies are presented. Those relate to the award of attorneys' fees and the role of the Fund.

## A.

After securing a judgment against Security at the trial level, SMA sought reimbursement for its attorneys' fees. The trial court, citing *Summonte v. First American Title Insurance Co.*, 180 *N.J.Super.* 605, 436 *A.*2d 110 (Ch.Div.1981), *aff'd o.b.*, 184 *N.J.Super.* 96, 445 *A.*2d 409 (App.Div.), *certif. denied*, 89 *N.J.* 418, 446 *A.*2d 148 (1982), awarded SMA counsel fees of $7,300. In *Summonte*, the plaintiffs had purchased property and obtained title insurance from the defendant. At the time, neither the plaintiffs nor the defendant knew that the property was subject to a lien of a judgment. The plaintiffs later asked the defendant, to

which the judgment had been assigned, to remove the lien, but the defendant refused. The court ordered the defendant to remove the lien in accordance with the title policy. The court concluded that the plaintiffs met the definition of *Rule* 4:42–9(a)(6).

We pointed out in *Sears* that *Rule* 4:42–9(a)(6) provides that an award of counsel fees may be allowed "in an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." 134 *N.J.* at 354, 634 *A.*2d at 88. We emphasized that a title-insurance policy is an "indemnity policy of insurance," *ibid.* (quoting *Summonte, supra,* 180 *N.J.Super.* at 610, 436 *A.*2d 110); the policy " 'is a contract of indemnity under which the insurer for a valuable consideration agreed to indemnify the insured in a specified amount against loss through defects of title to, or liens or encumbrances upon realty in which the insured has an interest.' " *Ibid.* (quoting *Walker Rogge Inc. v. Chelsea & Title Guar. Co.,* 116 *N.J.* 517, 528, 562 *A.*2d 208 (1989) (quoting *Sandler, supra,* 36 *N.J.* at 478–79, 178 *A.*2d 1)).

The Appellate Division affirmed the award of attorneys' fees to SMA, concluding that the closing-protection letter issued by Security to SMA was part of the title-insurance protection purchased. It stated: "An 'award of counsel fees is authorized by [*R.* 4:42–9(a)(6) ] even if the insurer's refusal to honor a policy demand was in good faith and despite the novelty of the legal question upon which its basic liability depended.' *Pressler, Current N.J. Court Rules,* Comment *R.* 4:42–9(a)(6) (1991)." 257 *N.J.Super.* at 31, 607 *A.*2d 1319.

Security now argues that the Appellate Division ignored the facts of the case when it awarded counsel fees pursuant to *Rule* 4:42–9(a)(6). It contends that the claims asserted at trial did not relate to title insurance but rather to conduct by SMA that occurred after the closing and were not covered by a title insurance policy.

We disagree. In *Sears,* we held that the purchaser who sued the title insurer to avoid a loss occasioned by his attorney's theft of funds, and succeeded on the basis of both agency principles and

the right to insurance protection against such a loss, was entitled to recover attorney's fees under *Rule* 4:42–9(a)(6). 134 *N.J.* at 355–356, 634 *A.*2d at 88. In this case, SMA, whose claim is based on its express right to insurance coverage under the closing-protection letter, is entitled to recover such attorney's fees.

## B.

Hart filed a claim against the Fund. The Fund denied Hart's claim because it concluded that he had a collateral source of recovery—Security and SMA. Under *Rule* 1:28–3(b)(5), the trustees of the Fund have the discretion to "determine which eligible claims merit reimbursement" and to rely on such factors as the "potential for recovery from a collateral source."

 Despite denying Hart's claim, the Fund set aside $50,000 in case a claim could later be substantiated. (In 1986, when the loss occurred, the maximum recovery from the Fund to individual claimants was $50,000; Hart's claimed loss was $91,000.) By setting aside money for Hart, the Fund was entitled to be subrogated to any claim Hart had against Security and SMA.

In 1989, when Hart sold the Eatontown property, he paid off the SMA mortgage. The remaining equity, $42,000, was put into escrow instead of being turned over to Hart. A month after the sale, the Fund paid Hart half of the escrow, $20,986, and Hart assigned the other half to the Fund. The Fund later brought its own action against Security, SMA, Alliance, Center, and Witkowski.

 In view of our holding that Security, the title-insurance carrier, is liable for the loss based on the closing-protection letter it furnished to SMA, the Fund became entitled to consider the insurance protection as a collateral source of recovery under *Rule* 1:28–3(b)(5). Nonetheless, we urge the Fund to reconsider the manner in which it applies the collateral-source provision. In *Sears*, the Fund required the claimants to await the outcome of the litigation before reimbursing them. 134 *N.J.* at 335–336, 634

*A.*2d at 78. That approach causes innocent victims of attorney misconduct severe hardship. Here, the Fund paid a part of the claim brought by Hart. Hart filed his claim in 1987, but received reimbursement of only one-fifth of his total loss in 1989, and today, in 1993, still awaits recovery of the balance. The Fund should consider paying off claimants in similar situations immediately now that we have established that title insurers are liable under these circumstances for their approved attorneys' theft of closing funds.

V

The judgment of the Appellate Division is affirmed.

CLIFFORD, J., dissenting.

I would hold that the dishonest attorney, defendant Witkowski, was the agent of the purchaser-borrower, defendant Hart. The existence of a closing-protection letter in this case, unlike the situation in the companion case of *Sears Mortgage Corporation v. Rose and Kaiser,* 134 *N.J.* 326, 634 *A.*2d 74 (1993), does not alter the consequences that flow from that agency relationship. I therefore vote to reverse the judgment below.

By selecting Witkowski as his attorney, Hart put the lawyer in the position to savage the transaction and plunder the funds. The mortgage lender, Southern Mortgage Associates, Inc. (Southern Mortgage), did not pick Witkowski; it had no choice but to deal with him, however, because Hart had designated him as his legal representative for the loan transaction and the statutory scheme bars lenders from requiring the borrower to use the lender's lawyer. See *N.J.S.A.* 46:10A–6. The client-protection letter does not change any of the foregoing. Its purpose is to provide certain specified indemnity to the lender for losses that result from the lender being forced to deal with an attorney with whom the lender is entirely unfamiliar. The attorney is an unknown quantity. Without the closing-protection letter Southern Mortgage, understandably, would not have made the mortgage loan. All of Wit-

kowski's dealings with Security Title and Guaranty Company (Security Title) and Southern Mortgage were on Hart's behalf. Witkowski had to deal with a title company because Southern Mortgage required a commitment to insure, a closing-protection letter, and a mortgage policy of title insurance. Without those documents Hart would not have obtained the loan.

At the mortgage closing Hart signed a promissory note in the amount of $91,000 and the mortgage itself. The signing of those documents constituted an acknowledgement that he had received the $91,000 from Southern Mortgage, and he gave his condominium as security for the loan. At the closing Hart received the check, made jointly payable to him and Witkowski. He endorsed it and left it with Witkowski so Witkowski could pay off the existing mortgage of Center Savings and Loan (Center). Hart never saw the mortgage-closing instructions that Southern Mortgage had sent to Witkowski, and nothing in the record suggests that Hart relied on any such instructions. Likewise, nothing indicates that Hart ever saw the closing-protection letter or that he was led thereby to believe that Witkowski was acting for either Southern Mortgage or Security for purposes of the loan transaction. When Hart finished with the closing, nothing remained for him to do. Plenty remained for Witkowski to do, the most important of which, paying off the Center mortgage, he failed to accomplish. In short, the transaction was a perfectly routine mortgage refinancing, made different only by virtue of the fact that Witkowski is a thief.

In my view because Witkowski's principal was Hart, the money Witkowski stole was Hart's, not Southern Mortgage's. Hart's endorsement made it possible for Witkowski to walk away with the money.

Moreover, Southern Mortgage did not promise Hart that it would pay off his prior mortgage, and no failure of consideration for the promissory note in the mortgage transaction resulted from Witkowski walking away with the mortgage proceeds. As the *amicus* brief makes plain, the practical meaning of the instruction

that tells the attorney not to disburse any loan proceeds without full compliance with the instructions is that the attorney must disburse some of the money to satisfy conditions of the loan that are contained in the closing instructions. What the instructions meant in this case is that to the extent necessary, the mortgage proceeds were to be used to satisfy the Center mortgage. Southern Mortgage knew nothing about the balance due on the Center mortgage. Moreover, the use of the phrase "as our closing agent" in the loan-closing instructions cannot be elevated to a controlling principle. Had Southern Mortgage considered Witkowski to be its agent, it could have made the check payable to Witkowski alone.

I disagree entirely with the Appellate Division's suggestion that Witkowski had to obtain cancellation of the Center mortgage before disbursing any of the Southern Mortgage loan proceeds. In fact, almost all of the $91,000 loan proceeds had to be disbursed to Center before Center would endorse on the original mortgage the fact that it had been paid and before it would return the document to Witkowski so it could be cancelled of record. The Center mortgage could not be cancelled before Witkowski disbursed any of the mortgage proceeds. Failure to have the Center mortgage cancelled of record before the disbursement of any of the $91,000 could not constitute lack of consideration for the promissory note. The consideration was in the form of the $91,000 loan-proceeds check, which Hart endorsed in blank. By endorsing that check, Hart acknowledged receipt of the money.

The Center mortgage is a valid one and is in default, and Security Title is a valid holder of that mortgage. It is entitled to foreclose. Hart is free to pursue his claim against the New Jersey Lawyers' Fund for Client Protection.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—Justice CLIFFORD—1.