788 A.2d 324 (2002)
GE CAPITAL MORTGAGE SERVICES, INC., successor in interest to State Street Bank & Trust Co., Plaintiff-Appellant,
v.
Joseph PRIVETERA, Conti Mortgage Corp., First American Title Insurance Co., and New Jersey Lawyers' Fund for Client Protection, Defendants, and
New Jersey Title Insurance Co., Robert Nils Herdelin, New Jersey Mortgage and Investment Corp., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 2001.
Decided January 14, 2002.
Gregg P. Tabakin argued the cause for appellant (Fein, Such, Kahn & Shepard, attorneys; Mr. Tabakin, on the brief).
*325 Richard A. Grossman, Brick, argued the cause for respondent Robert Nils Herdelin (Grossman, Kruttschnitt, Heavey & Jacob, attorneys; Mr. Grossman, of counsel; Thomas A. Morrone, on the brief).
Ben J. Slavitt, Newark, argued the cause for respondents New Jersey Title Insurance Co. and New Jersey Mortgage and Investment Corp. (Slavitt & Cowen, attorneys; Ronald G. Schecter, on the brief).
Before Judges SKILLMAN, CARCHMAN and WELLS.
The opinion of the court was delivered by CARCHMAN, J.A.D.
Following a real estate closing, the buyer's attorney absconded with the sale proceeds. The sale was conducted pursuant to an order of the bankruptcy court providing that the property was to be sold free and clear of all liens with the liens to attach to the proceeds. As a result of the attorney's defalcation, the existing first mortgage remained unpaid, and the first mortgagee then brought an action against the title company and other related parties seeking, among other relief, satisfaction of the first mortgage. On cross-motions for summary judgment, the chancery judge dismissed the complaint and entered judgment in favor of the title company, holding that the title company had no obligation to satisfy the outstanding mortgage. Plaintiff appeals, and we affirm.
These are the facts presented to the judge on the parties' cross-motions for summary judgment. Plaintiff GE Capital Mortgage Services ("plaintiff" or "first mortgagee") held a first mortgage on property located in Avalon and owned by James and Nancy Hudanich (collectively "Hudanich").[1] Hudanich filed a bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey. Plaintiff received relief from the automatic bankruptcy stay, and, as the mortgage was in default, filed a foreclosure action. Hudanich, thereafter, filed a motion before the bankruptcy court to sell the Avalon property to defendant Robert Nils Herdelin "free and clear of liens." See 11 U.S.C.A. § 1123(a)(5)(D). The bankruptcy judge entered an order authorizing and approving the sale to Herdelin, free and clear of liens and encumbrances "with said liens and encumbrances to attach to the proceeds of the sale."
Herdelin retained defendant Joseph Privetera, Esquire, to represent him at the closing. To finance the purchase, Herdelin obtained a $350,000 mortgage loan from defendant New Jersey Mortgage and Investment Corp. (N.J. Mortgage) to be secured by a first mortgage on the Avalon property. Prior to closing, N.J. Mortgage had obtained from defendant New Jersey Title Insurance Co. (the title company) a closing protection letter insuring N.J. Mortgage against loss by reason of Privetera's failure to comply with the closing instructions.
At closing on June 16, 1999, a deed was received from Hudanich, the mortgage loan was closed, and Privetera received the proceeds of the sale of $694,146.75 to await an order of the bankruptcy court authorizing disbursements. Significantly, N.J. *326 Mortgage's lien was insured by the title company as a valid first lien on the property, even though no proceeds had been disbursed, and plaintiff's mortgage remained of record. Herdelin declined title insurance. The parties understood that Privetera was holding the funds in escrow pending further instructions from the bankruptcy court. Plaintiff did not attend the closing.
On November 13, 1996, the bankruptcy judge signed a consent order authorizing disbursement of the proceeds of the sale of the Avalon property. Although the order identified Privetera as "settlement agent for New Jersey Title Insurance Company," neither N.J. Mortgage nor the title company appeared in the bankruptcy proceeding resulting in this order. After Privetera was notified of the consent order and asked to forward the funds to plaintiff's counsel, he confessed that he had misappropriated all of the proceeds from the closing. He was subsequently prosecuted, imprisoned and disbarred.
Plaintiff then filed a motion with the bankruptcy court seeking to reinstate its lien on the Avalon property. The motion was denied. Following denial of the motion, plaintiff filed an action in the Chancery Division seeking, among other relief, damages from the title company representing payment of plaintiff's outstanding and existing first mortgage.[2]
During the bankruptcy proceedings, Herdelin refinanced the property with a first mortgage loan from defendant Conti Mortgage Corp., which was insured by defendant First American Title Insurance Co., thus satisfying N.J. Mortgage's obligation.
Plaintiff's theory of recovery against the title company was premised on the contention that Privetera was acting as agent for the title company, N.J. Mortgage and Herdelin when he absconded with the proceeds of sale. In addition, plaintiff asserted that it was a third-party beneficiary of any contract between the title company and N.J. Mortgage, or N.J. Mortgage and Herdelin. The motion judge rejected plaintiff's argument and concluded that any agency relationship between Privetera and the title company had ceased prior to the defalcation, and plaintiff was not a third-party beneficiary of any agreement between defendants.
In asserting its claim against the title company, plaintiff relied on two Supreme Court decisionsSears Mortgage Corp. v. Rose, 134 N.J. 326, 634 A.2d 74 (1993), and Clients' Sec. Fund of the Bar of New Jersey v. Security Title and Guar. Co., 134 N.J. 358, 634 A.2d 90 (1993) (Clients' Security )which addressed the rights of parties in somewhat analogous factual circumstances. We detail the facts and holdings of both cases.
In Sears, the Court held that an attorney retained by a purchaser to represent him in the closing of a loan functioned as the agent of the title company, and, as a result, the title company must assume the losses resulting from the attorney's embezzlement of funds intended to pay-off an existing mortgage. 134 N.J. at 346, 634 A.2d 74. The purchaser, Kaiser, retained attorney Gillen to represent him in the sale of his home and the purchase of a condominium. Gillen requested a title insurance commitment from Commonwealth Land Title Insurance Company (Commonwealth) for Kaiser. The closing took place *327 at Gillen's office with the seller's attorney and Gillen agreeing that Gillen would pay off the mortgage with the proceeds of the sale. However, contrary to this agreement, Gillen never paid the mortgage. Instead, he misappropriated the closing funds, absconded, and was later criminally convicted, imprisoned, and disbarred. Because the Sears mortgage remained unpaid, Commonwealth refused to issue Kaiser an insurance policy without exception to the Sears mortgage. Sears then filed a foreclosure action. Id. at 333-36, 634 A.2d 74.
In affirming the Law Division determination, the Supreme Court concluded that the title company authorized and controlled the attorney's acts "for the purpose of applying the purchase moneys to satisfy and cancel an existing mortgage, securing clear title for the purchaser, and obtaining from the carrier a title-insurance policy covering that title," id. at 337, 634 A.2d 74. The Court noted that of all the parties involved, the title company was in the best position to have prevented the loss caused by the attorney's theft. Id. at 345-46, 634 A.2d 74. The Court also concluded that since title companies owe a duty of good faith and fair dealing to the proposed insured, they must not only warn the proposed insured of the "coverage needs where the insurer is aware of a particular peril," but must also provide coverage broad enough to fulfill the proposed insured's reasonable expectations. Id. at 349, 634 A.2d 74. Commonwealth had the "duty either to give Kaiser an opportunity to insure himself against the risk [of attorney defalcation] or, at the very least, to inform him that he was not covered against such a risk." Id. at 347, 634 A.2d 74.
In Clients' Security, the Supreme Court again addressed the issue of which party should bear the loss resulting from a closing attorney's theft of funds which were to be used to pay-off a first mortgage. 134 N.J. at 364, 634 A.2d 90. Unlike Sears, Client's Security involved an institutional third-party lender. Southern Mortgage Associates (SMA) approved Hart for a $91,000 loan, and Hart then retained attorney Witkowski to represent him in closing the SMA mortgage. The SMA commitment for the loan provided that Witkowski would close the loan for SMA in compliance with SMA's closing instructions including a requirement that Witkowski obtain title insurance naming SMA as the insured and that the previous mortgage be paid off at the closing.
Pursuant to these instructions, Witkowski obtained title insurance and a closing protection letter from Security Title and Guaranty Co. (Security Title). At the closing, Hart signed the note and mortgage and endorsed the loan proceeds check; however, instead of paying off the existing mortgage, Witkowski embezzled the mortgage proceeds. Security Title then fulfilled its obligation under the closing protection letter, paying the amount due on the first mortgage, taking assignment of that mortgage, and subordinating it to the SMA mortgage. After Hart refused its demand for payment, Security Title, as assignee of the first mortgage, commenced foreclosure proceedings.
The Supreme Court held that as between the mortgagor (Hart) and the title insurer, the insurer had to bear the loss resulting from the theft. Id. at 370, 634 A.2d 90. More specifically, in its analysis of this issue, the Court applying its reasoning in Sears, concluded that the closing attorney was an agent of the insurer. It stated:
[T]he elements that give rise to an agency relationshipthe authorization to the agent to perform functions on behalf of the principal, the agent's manifestation of consent to the agency, the ability to *328 control the agent, and the third party's reliance on the agent's apparent authority to act for the principalare present here to establish an agency relationship between Witkowski and Security [Title].

[Id. at 369, 634 A.2d 90.]
Additionally, the Court noted that Security Title was aware of the risk of attorney defalcation, should have been alerted to the risk in the case, and while it provided SMA protection against attorney defalcation, it did not offer protection to Hart or inform him that the risk was his to bear. Id. at 369-70, 634 A.2d 90. The Court concluded that while Security Title was in a superior position to confront the risk of attorney defalcation, it left Hart defenseless to avoid the loss. Ibid.
After deciding that issue, the Court addressed the relationship between Security Title and SMA. Pursuant to its obligations under the closing protection letter, Security Title paid off the existing mortgage in order to place SMA in the first lien position and became subrogated to the rights of SMA. However, the court refused to allow Security Title to recover from Hart for the following reasons:
Security [Title] owed Hart an independent obligation, arising out of its duty as a title insurer, to indemnify Hart as its putative insured for the loss incurred through Witkowski's theft. Second, although Security [Title], as a subrogee, succeeded to the rights of SMA against Hart, its claim against Hart was no stronger than SMA's claim; and, under the circumstances, SMA did not have the right to recover from Hart the loss attributable to the closing attorney's embezzlement.

[Id. at 371, 634 A.2d 90.]
The Court found that Witkowski was SMA's agent for the purpose of the closing and that SMA had placed Witkowski in a position which permitted him to steal the closing proceeds. Id. at 375, 634 A.2d 90. "Of all the principals, SMA, the lender, exercised the greatest degree of control over Witkowski and was in the best position to have avoided the loss. Thus, as between Hart and SMA, the lender should be liable for the attorney's defalcation, and so should its subrogee, Security [Title]." Ibid.
While the facts before us parallel Sears and Clients' Security, there are several significant distinctions which warrant a different result. The most important factual distinction is that in both Sears and Clients' Security, the liens remained on the properties until the closing attorney acted and applied the funds consistent with his obligation to his principalsthe title company, the mortgagee and buyer. Here, as a result of the bankruptcy order, the property was sold free and clear of all liens. More specifically, in Sears and Clients' Security, the attorneys were required to pay off the existing mortgages with the proceeds of the sale; however, they failed to do so, and the mortgages remained as liens on the property. Here, the property was to be sold free and clear of all liens, and disbursements were to be made, not to satisfy a title requirement, but subject to a subsequent order of the bankruptcy court. The satisfaction of plaintiff's mortgage was not a precondition to the issuance of title insurance.
The defining distinction between this case and Sears and Clients' Security is the operation of the bankruptcy order. The bankruptcy order effectively cut off the defendants' interest in this matter and terminated any agency relationship the title company or mortgagee may have had with Privetera[3]. The trial judge correctly observed:

*329 The wording of the Bankruptcy Order assured New Jersey Title that the property would pass free and clear of all liens regardless of when or how the money was paid to the former lien holders. Thus, the Bankruptcy Court Order removing all liens from the property made the role played by the title insurance company in this case very different from the role played by the title insurance companies in the Sears and Clients' Security Fund cases.
When title passed to Herdelin free and clear of all liens, the terms of the title company's insurance commitment were satisfied.
We also note that unlike Sears and Clients' Security, Herdelin, the buyer, did not purchase title insurance. The title company insured N.J. Mortgage only and breached no duty to Herdelin. The issue of "good faith" dealing with the buyer, a significant element encompassed in the analysis of both Sears and Clients' Security, is notably not an issue under the facts presented on this appeal. The title company informed N.J. Mortgage of the risk of defalcation and ultimately issued a mortgagee policy to N.J. Mortgage premised on the terms of the bankruptcy order.
Although Clients' Security suggests that as between the insured, insurer, purchaser or lender, the latter is in the best position to prevent the loss, exercised the greatest degree of control over the attorney, and should be held liable for the loss, Clients' Security, supra, 134 N.J. at 375, 634 A.2d 90, we do not perceive that allocation of responsibility as applying here. The bankruptcy order protects N.J. Mortgage and the title company, as its insurer, from any liability. The attorney's obligation was not to pay off plaintiff's existing mortgage but to collect the funds subject to future bankruptcy court direction. The order itself extinguished plaintiff's lien, and no responsibility to satisfy this lien was imposed on the closing attorney. Privetera's role as agent for N.J. Mortgage or the title company had ended.
If we were to accept plaintiff's position that the title company was responsible for the attorney's defalcation, plaintiff might have been in a better position than it was if its only relief was in the bankruptcy proceeding. The bankruptcy order contemplated that further proceedings would determine plaintiff's entitlement to the proceeds of sale subject to other secured creditors, governmental obligations and the panoply of general creditors and claims that may attend a bankruptcy proceeding. Although plaintiff held a first position and presumably would retain that first position as against the proceeds rather than as against the land, that issue would be determined in the bankruptcy proceeding. By suggesting that the title company must be responsible for plaintiff's outstanding obligation, plaintiff gains the advantage of bypassing the bankruptcy proceeding and achieving satisfaction of its outstanding obligation without the scrutiny of the bankruptcy court. That was neither contemplated by the parties nor intended by the order.
Unlike the parties in Sears and Clients' Security, plaintiff was in the best position to protect itself. It was a party to the bankruptcy proceeding through State Street, plaintiff's predecessor in interest, and had the ability to control the escrow created by the sale proceeds by urging that the funds be paid into the bankruptcy court or to another appropriate escrow agent. Failing to avail itself of these options, plaintiff can not now seek recompense from the title company.
*330 We likewise reject plaintiff's assertion that it is a third-party beneficiary of the insurance contract, specifically the closing protection letter, between the title company and N.J. Mortgage or the mortgage agreement between Herdelin and N.J. Mortgage. The test for determining whether a third-party has an actionable right under contract is whether contracting parties intended that a third party should receive a benefit which might be enforced in the court. "The contractual intent to recognize a right to performance in the third person is the key." Broadway Maint. Corp. v. Rutgers, The State Univ., 90 N.J. 253, 259, 447 A.2d 906 (1982). "If that intent does not exist, then the third person is only an incidental beneficiary, having no contractual standing." Ibid.; see also Smith v. Boyd, 272 N.J.Super. 186, 197-98, 639 A.2d 413 (Law Div.1993) (denying third-party beneficiary status under a title insurance policy to an unsuccessful bidder at a sheriff's sale who had relied on the defective title report holding that such benefit of the title report was merely incidental to the underlying contract).
Neither the closing protection letter nor the mortgage agreement provide a basis for concluding that plaintiff was a third-party beneficiary of these agreements. The closing protection letter protects N.J. Mortgage against Privetera's conduct. This is not the protection alluded to in either Sears or Client's Security that required payment of the outstanding first lien. The mortgage agreement only provides funds for the purchase, which under the facts here would ultimately be subject to the bankruptcy order. Plaintiff's "benefit" is purely incidental to that transaction.
Affirmed.
NOTES
[1] The provenance of the mortgage is that Hudanich gave a first mortgage in the principal amount of $650,000 to Shearson, Lehman, Hutton Mortgage Company (Shearson). The mortgage was first assigned to State Street Bank and Trust Company (State Street) which then assigned the mortgage to plaintiff. For ease of reference, we shall refer to plaintiff as the first mortgagee even though Shearson and State Street were involved at various stages of the underlying litigation.
[2] Plaintiff named numerous other defendants including the New Jersey Lawyers' Fund for Client Protection. By order of September 22, 1997, the complaint as to this defendant was dismissed, and, on appeal, we affirmed. GE Capital Mortgage Servs., Inc. v. New Jersey Title Ins. Co., 333 N.J.Super. 1, 3, 754 A.2d 558 (App.Div.2000).
[3] We observe that after learning of Privetera's defalcation, the bankruptcy court denied plaintiff's motion to reinstate its lien. At the hearing, the bankruptcy judge opined that clear title had passed even though the creditors had not been paid.