867 A.2d 1181

THEODORE PRICE, PLAINTIFF–RESPONDENT, v. NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT–APPELLANT.

Argued November 9, 2004—Decided March 10, 2005.

*Stephen O. Mortenson,* argued the cause for appellant (*Mortenson and Pomeroy,* attorneys; *Mr. Mortenson* and *Karen E. Heller,* on the briefs).

*John R. Gorman,* argued the cause for respondent (*Lutz, Shafranski, Gorman & Mahoney,* attorneys).

Justice WALLACE delivered the opinion of the Court.

The primary issue in this appeal is whether an insurer should be barred from raising the statute of limitations defense to an insured's claim for uninsured motorist benefits. The trial court found equitable reasons to reject the insurer's defense and compelled arbitration. The Appellate Division affirmed. *Price v. New Jersey Mfrs. Ins. Co.,* 368 *N.J.Super.* 356, 846 *A.*2d 617 (2004). Because of a dissent in the Appellate Division, the case is before us as a matter of right. *R.* 2:2–1(a)(2). We conclude that the trial court and the Appellate Division properly applied equitable principles to bar the insurer from raising a statute of limitations defense.

## I.

On August 30, 1995, plaintiff Theodore Price, a pedestrian in the course of his employment, was struck by a vehicle driven by Howard Wanderman. Plaintiff maintained insurance coverage with defendant New Jersey Manufacturers (NJM) that included uninsured motorist coverage. The policy's uninsured motorists coverage provision provides in relevant part:

If we and insured do not agree:

1. Whether that insured is legally entitled to recover damages; or

2. As to the amount of damages which are recoverable by that insured;

from the owner or operator of an uninsured motor vehicle or an underinsured motor vehicle, then the matter may be arbitrated.

Either party may make a written demand for arbitration. In this event, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction.

Sometime after the accident, plaintiff learned that Wanderman's insurance company had denied coverage for the accident. On February 12, 1998, plaintiff's attorney wrote to NJM alerting the company that plaintiff would be presenting an uninsured motorist claim and to "[p]lease establish an uninsured motorists claim file." By letter dated March 18, 1998, NJM's claims representative acknowledged receipt of plaintiff's letter and requested information as to plaintiff's injuries and the amount of any workers' compensation lien.

In May 1998, NJM again sought information regarding any workers' compensation lien. In a letter dated June 29, 1998, plaintiff's attorney notified NJM that plaintiff had instituted an action against Wanderman to protect NJM's subrogation interest and noted that the workers' compensation lien totaled $9,488.60. He expressly wrote that he would like "to proceed with [his] client's uninsured motorists claim" and inquired whether NJM intended to pursue subrogation against Wanderman. Plaintiff's attorney enclosed copies of plaintiff's medical records and other information to "allow [NJM] to begin to evaluate this claim." On September 24, 1998, plaintiff's attorney mailed the workers' compensation file to NJM, and the following day, NJM authorized plaintiff's attorney to dismiss the action against Wanderman.

On October 8, 1998, a different NJM claims representative requested copies of all plaintiff's medical bills and reports and his insurance declaration sheet to verify his tort threshold. Approximately four months later, plaintiff's attorney complied with that request.

On April 20, 1999, NJM scheduled a medical examination of plaintiff by its doctor for some time in September 1999. In August, NJM instructed plaintiff's attorney to place plaintiff's employer on notice of its claim, and requested a copy of the employer's workers' compensation policy. On September 14, 1999, plaintiff was examined by Dr. Bosniak. Although plaintiff's attorney sought a copy of Dr. Bosniak's medical report, NJM indicated its policy was not to provide the report. Plaintiff's attorney wrote

NJM challenging its refusal to supply the doctor's report and promised to contest admission of the report at trial or arbitration if NJM continued to refuse to comply. On April 13, 2000, NJM again declined to provide plaintiff with a copy of his medical report.

On January 15, March 1, and April 5, 2001, plaintiff's attorney sent NJM various documents including medical reports, employment records, a workers' compensation lien letter, and a medical authorization form. Finally, on August 21, 2001, nine days before the expiration date of the statute of limitations, NJM requested plaintiff's complete workers' compensation file, the original MRI films dated December 20, 1996, February 12, 1998, and November 20, 1998, and his employer's "policy language regarding their UM [uninsured motorist] limits and exposure to this loss."

On September 20, 2001, plaintiff's attorney forwarded most of the requested documents and indicated he would forward the MRI films as soon as he received them. Plaintiff's counsel continued to send additional information to NJM in letters dated October 1, 2001, March 27, April 23, and September 27, 2002. In his last letter, counsel demanded that NJM evaluate the file for settlement purposes and noted that as of March 20, 2002, the workers' compensation lien exceeded $53,326. NJM did not reply to any of those letters.

On November 22, 2002, plaintiff filed a complaint and Order to Show Cause seeking to compel NJM to participate in arbitration. NJM asserted that plaintiff failed to formally request coverage or demand arbitration prior to the expiration of the statute of limitations on August 30, 2001; therefore, it was not required to participate in arbitration.

The trial court "found that NJM's course of conduct had lulled plaintiff's attorney into a false sense of having timely made a UM [uninsured motorist] claim." The Appellate Division affirmed, holding that NJM was estopped from raising the statute of limitations defense and that it should have notified plaintiff of its intent to rely on the statute of limitations. *Price, supra,* 368

*N.J.Super.* at 363, 366, 846 *A.*2d at 621–22,. The dissenting judge disagreed, finding no trickery or misconduct by NJM sufficient to apply equitable estoppel. *Id.* at 367, 846 *A.*2d at 624. NJM appealed as of right on that issue. We also granted NJM's separate petition for certification on the issue of whether the Appellate Division's notification rule should apply retroactively or prospectively. 181 *N.J.* 546, 859 *A.*2d 691.

## II.

In *Green v. Selective Insurance Co. of America,* we determined that the six-year statute of limitations applied to uninsured motorist claims and that the statute begins to run from the date of the accident. 144 *N.J.* 344, 354, 676 *A.*2d 1074, 1080 (1996). Here, plaintiff was injured on August 30, 1995, and did not file his complaint until November 22, 2002. Absent some relief, the six-year statute of limitations bars plaintiff's claim.

"The primary purpose of the statute of limitations is to provide defendants a fair opportunity to defend and to prevent plaintiffs from litigating stale claims." *W.V. Pangborne & Co., Inc. v. New Jersey Dep't of Transp.,* 116 *N.J.* 543, 563, 562 *A.*2d 222, 232 (1989) (citing *Ochs v. Fed. Ins. Co.,* 90 *N.J.* 108, 112, 447 *A.*2d 163, 165 (1982); *O'Keeffe v. Snyder,* 83 *N.J.* 478, 490–91, 416 *A.*2d 862, 868–69 (1980)). Consistent with that purpose, "where defendants are on notice of the claims, and no significant prejudice results, the policy reasons for upholding a strict statute of limitations recede." *Ibid.*

To avoid harsh results from a mechanical application of the statute of limitations, this Court has applied equitable principles to conclude that the statute should yield to other considerations. We noted in *Negron v. Llarena,* 156 *N.J.* 296, 300, 716 *A.*2d 1158, 1160 (1998), that "[p]rocedural statutes of limitations are not applied strictly. Flexible applications of procedural statutes of limitations may be based on equitable principles, such as the discovery rule,

*e.g., Lopez v. Swyer,* 62 *N.J.* 267, 300 *A.*2d 563 (1973), or estoppel, *e.g., O'Keeffe v. Snyder,* 83 *N.J.* 478, 416 *A.*2d 862 (1980)."

In short, under varying circumstances we have recognized that tolling of the statute of limitations is the fair and responsible result, because the "[u]nswerving 'mechanistic' application of statutes of limitations would at times inflict obvious and unnecessary harm upon individual plaintiffs without advancing [the] legislative purposes." *Galligan v. Westfield Ctr. Serv., Inc.,* 82 *N.J.* 188, 192, 412 *A.*2d 122, 124 (1980). *See also Peloso v. Hartford Fire Ins. Co.,* 56 *N.J.* 514, 521, 267 *A.*2d 498, 501 (1970) (holding fair resolution of statutory incongruity is to toll period of limitation from time insured gives notice until liability is formally declined by insurer).

## III.

The undisputed facts here support an equitable tolling of the statute of limitations. Plaintiff's attorney first notified NJM on February 12, 1998, that plaintiff "would be presenting an uninsured motorists claim," and on June 29, 1998, he wrote that plaintiff "would like to proceed with [his] uninsured motorist claim[s]." In the latter letter he enclosed various documents to permit NJM "to begin to evaluate this claim." In addition, plaintiff informed NJM that he filed a lawsuit against the tortfeasor to protect the interest of NJM. A NJM claims representative wrote to plaintiff's counsel on October 8, 1998, that she was now handling plaintiff's claim and requested "copies of all medical bills and reports on [plaintiff] as they become available." During the next several years, NJM received various information necessary to evaluate plaintiff's claim, including a medical examination of plaintiff.

Plaintiff met each of NJM's requests. In fact, NJM's last request was dated August 21, 2001, nine days before the expiration of the statute of limitations. At that time, NJM asked for the complete workers' compensation file, plaintiff's employer's "policy language regarding their UM limits and exposure to his loss," and

the original MRI films. Plaintiff's counsel responded with most of the requested information on September 20, 2001, and thereafter continued to forward, upon receipt, information relative to the claim. It was not until October 28, 2002, more than a year after the statute would have otherwise run, that NJM notified plaintiff that the statute of limitations barred his claim.

We have declared that every insurance contract contains an implied covenant of good faith and fair dealing. *Sears Mortgage Corp. v. Rose*, 134 *N.J.* 326, 347, 634 *A.*2d 74, 84 (1993); *Griggs v. Bertram*, 88 *N.J.* 347, 360–61, 443 *A.*2d 163, 170 (1982). "The insurance company, as the dominant party, however, has an even greater obligation than the insured to act in good faith. It must not put 'technical encumbrances or hidden pitfalls' in the way of unsophisticated customers that would undermine their 'reasonable expectations.'" *Rose, supra,* 134 *N.J.* at 347, 634 *A.*2d at 84 (quotation omitted).

In dealing with plaintiff, NJM was required to act in a fair manner and inform plaintiff if there were any deficiencies in his claim or if he needed to file a request for arbitration by a certain date. It was not reasonable for NJM to sit back, request and receive various documents over a three and one-half year period, and then deny plaintiff's claim because he failed to file a complaint in Superior Court or request arbitration prior to the running of the six-year statute of limitations. We agree with the Appellate Division majority that NJM had a duty of good faith to notify plaintiff if it disagreed with his understanding that NJM was duly acting upon his filed claim. *See Rose, supra,* 134 *N.J.* at 354, 634 *A.*2d at 87–88; *Clients' Sec. Fund of the Bar of New Jersey v. Sec. Title & Guar. Co.,* 134 *N.J.* 358, 372, 634 *A.*2d 90, 96–97 (1993). We conclude that NJM violated the duty of good faith and fair dealing.

Moreover, *Mortara v. Cigna Property & Casualty Insurance Co.,* 356 *N.J.Super.* 1, 811 *A.*2d 458 (App.Div.2001), *aff'd,* 174 *N.J.* 566, 811 *A.*2d 404 (2002), does not suggest a different result. In *Mortara, supra,* the plaintiff was injured while driving a school

bus. 356 *N.J.Super.* at 2, 811 *A.*2d at 459. The alleged tortfeasor had maximum liability coverage of $50,000, the same as the plaintiff's personal liability and UIM coverage. *Ibid.* The plaintiff's employer's policy had a $1,000,000 UIM limit. *Ibid.* After receiving the tortfeasor's policy limits, the plaintiff sought UIM coverage under both her own policy and her employer's policy. *Id.* at 3, 811 *A.*2d at 459–60. Both carriers expressly denied coverage and the plaintiff failed to file a complaint in Superior Court until eleven months after the six-year statute of limitations expired. *Ibid.*

The Appellate Division held, and we agreed, that when the carrier denies coverage *within* the statute of limitations period, "[a] claim must be commenced by filing a complaint and is not commenced by writing letters or negotiating with one's adversary." *Id.* at 3–4, 811 *A.*2d at 460. Under those circumstances, the Court found no reason to invoke estoppel. *Id.* at 4, 811 *A.*2d at 460. Here, unlike the defendants in *Mortara*, despite having received all requested medical records and other requested documentation, NJM never disclaimed or even questioned coverage until *after* the statute of limitations expired.

█ To summarize, the record amply supports the trial court's finding that NJM's conduct lulled plaintiff and his counsel into believing that the uninsured motorist claim had been properly filed. Plaintiff reasonably relied on NJM's conduct in failing to file a complaint or to request arbitration within the statute of limitations period. That limitations period "should not become a[n] instrument of injustice." *Procanik by Procanik v. Cillo*, 97 *N.J.* 339, 351, 478 *A.*2d at 762 (1984). The fair resolution of this matter is to permit plaintiff to arbitrate his claim. NJM acknowledged that it was not prejudiced and there is no suggestion otherwise. Most importantly, the result here is not repugnant to the policies served by the statute of limitations. *W.V. Pangborne & Co., Inc., supra,* 116 *N.J.* at 563, 562 *A.*2d at 232. We conclude the trial court properly rejected NJM's statute of limitations defense.

## IV.

■ NJM argues that the trial court should have held a plenary hearing for plaintiff to demonstrate that his reliance on NJM's conduct caused him to fail to timely file a complaint. We disagree.

Plaintiff filed an Order to Show Cause pursuant to *Rule* 4:67–1 and –2. Our court rules provide that the trial court, "if satisfied with the sufficiency of the application, shall order the defendant to show cause why final judgment should not be rendered for the relief sought." *R.* 4:67–2(a).

Here, the parties disagreed over the legal implications of their interactions between February 12, 1998, and September 2002. However, they did not disagree on the material facts. The trial court heard oral argument and applied the law to the undisputed facts. Because the parties did not dispute the material facts, there was no need for a plenary hearing.

## V.

Finally, we do not read the Appellate Division opinion as requiring a notice requirement in all cases where the insurer intends to raise a statute of limitations defense. Rather, the majority essentially found that NJM was equitably estopped from raising a statute of limitation defense because during its investigation NJM acted as though plaintiff's claim had been filed, and it failed to inform plaintiff that its investigation did not toll the running of the applicable statute of limitations. That finding merely reflects a desire for the fair exchange of information between the insured and the insurer to satisfy the covenant of good faith and fair dealing implicit in every contract. The result here will not unduly interfere with the contractual relationship between the insurer and its insured, but instead will promote fair dealing.

That conclusion is not new. More than twenty years ago we declared that

[u]pon the receipt from its insured of a claim or notification of an incident that may give rise to a claim, an insurer is entitled to a reasonable period of time in which to investigate whether the particular incident involves a risk covered by the terms of the policy. But once an insurer has had a reasonable opportunity to investigate, or has learned of grounds for questioning coverage, it then is under a duty promptly to inform its insured of its intention to disclaim coverage or of the possibility that coverage will be denied or questioned.

Unreasonable delay in disclaiming coverage, or in giving notice of the possibility of such a disclaimer, even before assuming actual control of a case or a defense of an action, can estop an insurer from later repudiating responsibility under the insurance policy.

[*Griggs, supra,* 88 *N.J.* at 357, 443 *A.*2d at 168 (internal citations omitted).]

## VI.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—6.

Opposed—None.