696 A.2d 728

NEW JERSEY LAWYERS' FUND FOR CLIENT PROTECTION, PLAINTIFF–RESPONDENT, v. FIRST FIDELITY BANK, N.A., DEFENDANT–APPELLANT, AND ALLSTATE INSURANCE COMPANY; WACHOVIA BANK AND TRUST CO., N.A.; GOVERNMENT EMPLOYEES INSURANCE COMPANY; RIGGS NATIONAL BANK; CIGNA INSURANCE COMPANY; CONNECTICUT NATIONAL BANK; THE TRAVELERS INDEMNITY COMPANY; NATIONAL RAILROAD PASSENGER CORP.; FIRST OMNI BANK, N.A.; CAMBRIDGE MUTUAL FIRE INSURANCE COMPANY; BAY BANK MIDDLESEX; STATE OF NEW JERSEY, DEPARTMENT OF THE TREASURY; NEW JERSEY NATIONAL BANK; THE HOME INSURANCE CO.; CITICORP (CITIBANK); CSC INSURANCE SERVICES; THE FARMERS' MUTUAL FIRE ASSURANCE ASSOCIATION OF NEW JERSEY; ESE CORP.; MCA INSURANCE COMPANIES; MIDLANTIC NATIONAL BANK; EMPLOYERS REINSURANCE CORPORATION; BOATMEN'S BANK OF MARSHALL; MERCER MUTUAL INSURANCE CO.; PRUDENTIAL COMMERCIAL INSURANCE COMPANY, AND NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION AND MARKET TRANSITION FACILITY OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted May 14, 1997—Decided July 9, 1997.

Before Judges KING, KEEFE and CONLEY.

*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys for appellant (*John D. North,* of counsel and on the brief).

*Roger S. Steffens,* attorney for respondent New Jersey Lawyers' Fund for Client Protection.

*Golden, Rothschild & Spagnola,* attorneys for respondents, New Jersey Automobile Full Insurance Underwriting Association and Market Transition Facility of New Jersey (*C. Edward Speidel,* of counsel and on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

## I.

In 1968 the Supreme Court adopted a Rule authorizing and creating a fund, currently called the "New Jersey Lawyers' Fund for Client Protection" (Lawyers' Fund) [1], to reimburse clients who sustain losses caused by dishonest members of the New Jersey

---

[1] Prior to 1992 the Lawyers' Fund was called the Clients' Security Fund of the Bar of New Jersey (Clients' Fund).

bar. The Lawyers' Fund is administered by a seven-member Board of Trustees (Trustees) appointed by the Supreme Court. *R.* 1:28–1. "The trustees shall adopt rules and regulations, consistent with these rules and subject to the approval of the Supreme Court, governing the administration of the Fund, the procedures for the presentation, consideration and payment of claims, and the exercise of their investment powers." *R.* 1:28–1(d). The Lawyers' Fund is financed primarily through mandatory annual contributions from New Jersey attorneys.[2] *R.* 1:28–2. The Trustees are authorized in "their sole discretion" to determine which claims "merit reimbursement from the Fund and the amount, time, manner, conditions and order of payment of reimbursement." *R.* 1:28–3(b). The Trustees may require a claimant to execute an assignment, subrogation agreement, trust agreement, and a promise to cooperate with the Trustees in making or prosecuting claims or charges against any person as a condition to payment from the Lawyers' Fund. *R.* 1:28–3(e).

In this case the Lawyers' Fund paid fifteen former clients of James V. Higgins, Esquire, now deceased, who had settled their tort claims without the clients' knowledge, forged the clients' signatures, and embezzled the clients' funds. The Higgins' clients assigned their rights to the Lawyers' Fund. The Lawyers' Fund, as assignee and subrogee of the defrauded clients, brought a suit for conversion against the depositary bank, First Fidelity Bank (FFB), for accepting the clients' forged indorsements. The Law Division judge granted summary judgment to the Lawyers' Fund. FFB appeals contending (1) the banks' liability for accepting the forged indorsements was not the proximate cause of the clients' losses, and (2) the transfer of the loss from the Lawyers' Fund to an "innocent" party violates public policy and the goals of the Lawyers' Fund. We disagree and affirm.

---

[2] The current annual contribution ranges from $48 to $145 depending on the number of years at the Bar.

## II.

The facts are not in dispute. James V. Higgins, admitted to practice law in New Jersey in 1965, was a sole practitioner who maintained offices in South Amboy, New Jersey. He died on September 1, 1992. After his death, his widow discovered that he had settled a number of personal injury actions without the knowledge of the clients, forged their signatures on the settlements checks, negotiated the checks, and stolen the funds.

The Lawyers' Fund made an application to the Superior Court, Chancery Division, Middlesex County, for the appointment of a custodial receiver for the Higgins estate, including the former law practice. The custodial receiver recovered about $208,000 for the benefit of Higgins' creditors, representing money stolen from clients and used by Higgins for the purchase and maintenance of real estate owned by him and his widow.

Simultaneously with the appointment of the custodial receiver the Lawyers' Fund began processing claims against Higgins and ultimately paid $292,000 on twenty-six claims involving his dishonest conduct. Upon payment of the claims, the Lawyers' Fund received an assignment from each of the claimants of their claims against Higgins and any other party involved in the transaction giving rise to the claims.

## III.

On September 19, 1994 the Lawyers' Fund filed a forty-five count complaint, as assignee and subrogee of fifteen former Higgins clients, against various banks and insurance companies seeking damages for conversion and for paying checks with forged indorsements. Appellant First Fidelity Bank (FFB) was one of the banks sued by the Lawyers' Fund. On December 12, 1994 FFB answered the complaint, asserted seventeen defenses and cross-claimed against the other defendants for indemnification and contribution. Several other defendant banks answered the complaint (and filed cross-claims against the other defendants): Wa-

chovia Bank of N.A.; Shawmut Bank of Connecticut, N.A.; Baybank Boston, N.A.; Citibank, DE.; Boatman's Bank of Marshall; and Midlantic Bank, N.A. Government Employees Insurance Co. (GEICO) and Riggs National Bank jointly answered the complaint and cross-claimed against the various defendants.

In August 1995 the banks and GEICO jointly moved for summary judgment. The Lawyers' Fund cross-moved for summary judgment. Judge Shuster (1) granted summary judgment in favor of the Lawyers' Fund and against FFB for two-thirds (recovery net of fee) the face amount of the drafts; (2) granted summary judgment in favor of the other payor banks, pay-through-banks, and insurance companies and against the Lawyers' Fund; and (3) denied FFB's motion for summary judgment.

On September 25, 1996 First Union National Bank, successor of FFB, filed a notice of appeal with this court. FFB and the Lawyers' Fund are the only parties participating in this appeal. FFB contends that the Lawyers' Fund has no right to maintain a subrogation action against anyone other than the defrauding attorney. We disagree.

## IV.

Both parties look to the history of R. 1:28 to support their respective positions on whether the Lawyers' Fund can subrogate against the bank. FFB cites various comments made prior to the adoption of the Clients' Fund rule by Dickinson R. Debevoise, the original chairman of the Clients' Security Fund Committee, to demonstrate that the "only collateral source or subrogation action that appears to have been contemplated [at the time of the rule's proposal] is an action against the dishonest attorney." The Lawyers' Fund argues that when the Clients' Fund rule was originally adopted, the philosophy was that the Fund would be a source of last resort for defrauded clients but that over the years the policy governing the Lawyers' Fund has changed, as demonstrated by textual changes in the Rule. Now, the Lawyers' Fund can pay a

client before the client pursues the collateral source and the Lawyers' Fund can then itself pursue the collateral source.

### 1. The Original Proposed Rule, *R.* 1:22A.

In 1968 the Trustees of the New Jersey State Bar Association approved the Clients' Security Fund Supreme Court Committee's proposal for a court rule governing the proposed Clients' Security Fund. 91 *N.J.L.J.* 329 (May 23, 1968). The proposed rule, *R.* 1:22A, authorized and created a fund called the "Clients' Security Fund of the Bar of New Jersey." "The purpose of the Fund shall be to maintain the integrity and protect the good name of the legal profession by reimbursing, to the extent deemed proper and feasible by the Trustees, losses caused by the dishonest conduct of members of the Bar of the State of New Jersey." Proposed *R.* 1:22A–1(c) printed in 91 *N.J.L.J.* 329. Under the proposed rule the Trustees had the power to "enforce claims for restitution, arising by subrogation or assignment or otherwise." Proposed *R.* 1:22A–3(a)(4) printed in 91 *N.J.L.J.* 329. The Committee proposed the following as *R.* 1:22A–8(e):

Claims.

. . .

(e) In addition to other conditions and requirements the Trustees may require each claimant, as a condition of payment, to execute such instruments, to take such action, and to enter such agreements as the Trustees may desire, including assignments, trust agreements and promises to co-operate with the Trustees in making and prosecuting claims or charges against any person.

[91 *N.J.L.J.* 329.]

There was no mention of "collateral sources" in the proposed rule. The Supreme Court placed the proposal on the agenda of the May 24, 1968 Judicial Conference. 91 *N.J.L.J.* 329.

### 2. The Original Rule, *R.* 1:22A.

On December 17, 1968 the Supreme Court adopted the Clients' Security Fund rule, *R.* 1:22A, which became effective on January 1, 1969. 92 *N.J.L.J.* 1 (January 2, 1969). *R.* 1:22A–1 stated that the purpose of the Clients' Security Fund of the Bar of New Jersey "is the reimbursement, to the extent and in the manner

provided by these rules, of losses caused by the dishonest conduct of members of the bar of this State." 92 *N.J.L.J.* 1. This "purpose" language has remained constant. *See* the current *R.* 1:28–1(a). The "Payment of Claims" section of the original rule stated in pertinent part:

(a) Eligible Claims.  The trustees may consider for payment all claims resulting from the dishonest conduct of a member of the bar of this State acting either as an attorney or fiduciary, provided that:

    .      .      .      .      .      .      .      .

(4) The trustees are satisfied that there is no other collateral source, such as a fidelity bond for the reimbursement of the claim.

[*R.*  1:22A–3(a)(4) published in 92 *N.J.L.J.* 1.]

The Supreme Court adopted the proposed provision giving the trustees the right to require a claimant to enter into agreements including assignments, subrogation agreements, trust agreements or promises to cooperate in "making and prosecuting claims or charges against any person." *R.* 1:22A–3(e). Under *R.* 1:22A–5, "General Powers of Trustees," the Supreme Court gave the trustees the general power "(b) to enforce claims which the Fund may have for restitution." 92 *N.J.L.J.* 9.

On January 23, 1969 the trustees adopted "rules and regulations" for the Clients' Fund, which were approved by the Supreme Court on February 13, 1969. 92 *N.J.L.J.* 113 (Feb. 20, 1969). The regulation concerning the consideration of reimbursement claims provided in pertinent part:

The trustees shall not allow a claim where there is a collateral source, such as a fidelity bond, for the reimbursement of the claim, and except in cases of extreme hardship the trustees shall not allow a claim until the claimant has pursued all other sources of recovery available to him.

[Regulation 3.2(b) published in 92 *N.J.L.J.* 119.]

### 3.  Subsequent Changes to *R.* 1:28.

On February 25, 1969 Chief Justice Weintraub and the Supreme Court adopted a revision of the *Rules of the Courts of the State of New Jersey* which became effective on September 8, 1969. *See* Pressler, *Current N.J. Court Rules,* (GANN) at iii. The Clients' Security Fund rule remained substantively unchanged in the 1969

revision but was renumbered *R.* 1:28. The former "Payment of Claims" provision, *R.* 1:22A–3(a)(4), became *R.* 1:28–3(a)(4). The provision granting the Trustees the power to enforce claims for restitution, *R.* 1:22A–5(b), became *R.* 1:28–5(b).

On February 15, 1990 the Trustees proposed several modifications of *R.* 1:28 (suggestions reprinted in 125 *N.J.L.J.* 388 (Feb. 15, 1990)). Prior to the proposed changes to *R.* 1:28–5 the committee stated:

> It has been the policy of the Board of Trustees to pursue any claim for reimbursement assigned by a claimant. It was felt that *R.* 1:28–5(b) should be amended to clarify that policy. *The Fund's ability to recoup monies paid on claims is not limited to seeking restitution from the defalcating attorney but extends to all parties liable to a claimant in the transaction giving rise to the claim.*
>
> [125 *N.J.L.J.* 388 (emphasis added).]

On June 29, 1990 the Supreme Court adopted three of the Trustee's suggested changes to *R.* 1:28, which took effect on September 4, 1990. First, the "eligible claims" provision, requiring the Trustee's satisfaction that no other collateral sources are available to the claimant, was deleted. *See R.* 1:28–3(a). Second, "[t]he potential for recovery from a collateral source" was added to the list of appropriate factors that the trustee shall consider when determining if a claim should be paid. *R.* 1:28–3(b)(5). Third, the "general powers" of the Trustees was amended from permitting the Trustees to enforce claims for *restitution,* to permitting the Trustees to "enforce claims which the Fund may have for *reimbursements."* *R.* 1:28–5(b) (emphasis added). In 1992 *R.* 1:28 was amended effective September 1992 to reflect the name change to the New Jersey Lawyers' Fund for Client Protection.

### 4. Textual Analysis and Conclusion regarding the History of *R.* 1:28.

Both parties are correct in their analysis of the history of the Clients' Fund rule. FFB is correct in stating that at the time of its proposal and adoption, the Clients' Fund was considered to be a source of last resort. The Clients' Fund rule, as originally enacted, explicitly prohibited its Trustees from paying a claimant

if the claimant could collect from a collateral source. Additionally, Regulation 3.2(b) prohibited the Trustees from paying a claim until a claimant exhausted all collateral sources, except in cases of undue hardship. If the Clients' Fund paid a claim under the original rule it was entitled to seek "restitution" from the defrauding attorney. The problem with FFB's analysis, unlike the Lawyers' Fund analysis, is it does not consider the Clients' Fund rule's subsequent history.

■ The 1990 textual changes and the Trustees comments to the proposed changes to the Lawyers' Fund rule, support the view that the philosophy of the rule's implementation changed from considering the Lawyers' Fund a source of last resort to allowing the Lawyers' Fund to pay a claim earlier and then pursue the collateral sources. In 1990 the provision of the Clients' Fund rule forbidding the Trustees to pay a claim if a collateral source was available to the client was deleted.[3] Also, the rule was amended to allow the Trustees to consider a claimant's potential recovery from a collateral source. Finally, the Trustees were empowered to seek not only "restitution" but "reimbursements." The modification of "restitution" to "reimbursements" appears to have been a deliberate and meaningful change by the drafters because it was made at the same time the prohibition of the Trustees' ability to pay a claimant where collateral sources were available was eliminated. It appears that under the original draft of the rule, the trustees could seek "restitution" from the defrauding attorney. Black's Law Dictionary 1313 (6th ed.1990) defines "restitution" in pertinent part as:

> Act of restoring; restoration; restoration of anything to its rightful owner; the act of making good or giving equivalent for any loss, damage or injury; and indemnification.

There is a limited or negative connotation associated with "restitution"—in that definition when one is making restitution, the "wrongful" taker is giving something back to the "rightful" owner.

---

[3] Regulation 3.2(b) is still in effect. The regulations, however, cannot be inconsistent with R. 1:28. See R. 1:28-1(d).

Therefore, the original rule narrowly envisioned that "restitution" would come from the defrauding attorney. Black's Law Dictionary 1287 (6th ed.1990) defines "reimburse" as:

> To pay back, to make restoration, to repay that expended; to indemnify, or make whole.

Because of the lack of the "rightful owner" language in this definition, "reimbursement" does not have such a narrow or negative connotation. Thus, the change from "restitution" to "reimbursement" indicates that the Trustees are free to pursue collateral sources other than the defrauding attorney. The overall history of the textual changes to the Lawyers' Fund rule supports a conclusion that under the current philosophy, the Lawyers' Fund is entitled to pay a claimant and seek reimbursements from sources other than the defrauding attorney.

### 5. Supreme Court dicta supports the Lawyers' Fund theory of recovery.

In this decade, the Supreme Court has alluded to the "current" philosophy of having the Lawyers' Fund pay defrauded clients and then, as assignee or subrogee, seek reimbursement from collateral sources. In *Clients' Security Fund v. Security Title*, 134 *N.J.* 358, 363, 634 *A.*2d 90 (1993), the issue before the court was "which party participating in the closing of a real estate title must ultimately absorb the loss caused by the closing attorney's theft of moneys earmarked for the payment of an existing first mortgage on the property." In *Security Title* Hart hired attorney Joseph Witkowski to represent him in the purchase and financing of a condominium. Witkowski ordered and received a title report from Security Title. Hart gave Witkowski money to cover the title-insurance premium which Witkowski never forwarded to Security Title. The title policy was never issued. About a year later, Hart retained Witkowski to represent him in the refinancing of his condominium. Witkowski ordered a title report and commitment from Security Title. The commitment listed the second mortgagee as the proposed insured and required Hart to pay off and cancel the first mortgage. Security Title issued a "closing-protec-

tion letter" which protected the second mortgagee against the risk of the closing attorney's fraud or theft. Before the closing, the second mortgagee forwarded, among other things, a check payable to Hart and Witkowski. Witkowski had Hart indorse the check and then forwarded a certification to the second mortgagee stating that loan was now secured by a first mortgage on Hart's property. Witkowski stole the closing money and was prosecuted, convicted, sentenced and disbarred. The second mortgagee called on Security Title to fulfill its obligation under the closing-protection letter. Security Title paid the first mortgagee, took an assignment of the mortgage, subordinated its mortgage to the second mortgagee, and sought payment from Hart.

Hart then filed a claim with the Clients' Fund. The Client's Fund denied the claim but set aside $50,000 in the event the claim could later be substantiated. Security Title filed a Chancery Division complaint to foreclose on the mortgage; Hart answered, counterclaimed and filed a third-party complaint against Witkowski. While the case was pending Hart sold the property, paid the second mortgagee, and placed the proceeds into an escrow account. The Clients' Fund paid Hart half of the escrow amount and Hart assigned half of his interest in the escrow proceeds to the Clients' Fund. The Clients' Fund then brought an action against Security Title, the first mortgagee, the second mortgagee, and Witkowski.

After the Court held that Security Title, the title-insurance carrier, was liable for the loss based on the closing-protection letter it had furnished to the second mortgagee, the Court discussed Hart's claim against the Clients' Fund. *Id.* at 378–79, 634 *A.*2d 90. The Court stated: "by setting aside money for Hart, the Fund was entitled to be subrogated to any claim Hart had against Security and [the second mortgagee]." *Id.* at 378, 634 *A.*2d 90. This demonstrates to us that the Court now agrees that the Clients' Fund can subrogate against persons other than the defrauding attorneys. The Court stated, albeit in dicta:

> In view of our holding ... the Fund became entitled to consider the insurance protection as a collateral source of recovery under *Rule* 1:28–3(b)(5). Nonetheless, we urge the Fund to reconsider the manner in which it applies the collateral-source provision. In *Sears,* the Fund required the claimants to await the outcome of the litigation before reimbursing them. [*Sears Mortg. Corp. v. Rose,*] 134 *N.J.* [326] at 335–336, 634 *A.2d* [74] at 78 [(1993)]. That approach causes innocent victims of attorney misconduct severe hardship. Here, the Fund paid a part of the claim brought by Hart. Hart filed his claim in 1987, but received reimbursement of only one-fifth of his total loss in 1989, and today, in 1993, still awaits recovery of the balance. The Fund should consider paying off claimants in similar situations immediately now that we have established that title insurers are liable under these circumstances for their approved attorneys' theft of closing funds.
> [*Id.* at 378–79, 634 *A.2d* 90.]

This passage supports the Lawyers' Fund's position that consistent with the "current" philosophy, it can pay a claim promptly to avoid a claimant enduring the process of collecting from a collateral source and then the Lawyers' Fund, as subrogee or assignee of the claimant's rights, can seek reimbursement from the collateral sources.

### 6. Other Jurisdictions Permit Subrogation

Other jurisdictions which have similar client funds have permitted them to subrogate against collateral sources. In Florida, the Clients' Security Fund, maintained by the Florida Bar, compensates defrauded clients under a system similar to New Jersey's Lawyers' Fund. In *Southeast First National Bank of Miami v. Florida Bar,* 389 *So.*2d 1222, 1222 (Fla.Dist.Ct.App.1980), an attorney forged a client's indorsement on a check and converted the funds to his own use through the Southeast National Bank. The Clients' Security Fund paid the client $4,300 and the client executed an assignment and subrogation agreement, as explicitly authorized by Florida's Integration Rule. *Id.* at 1222–23. The court found that the "payee [client] would be entitled to recover from the Defendant for conversion of the check as a result of its payment on a forged and unauthorized endorsement." *Id.* at 1223, citing to the Florida UCC statute. The Florida appellate court held that the Clients' Fund, as assignee of the payee's cause of action, was entitled to recover the amount of the actual loss sustained by the client from the bank. In reaching this decision

the court compared the then-current version of the rule with the previous version of the rule. The 1966 rule provided in pertinent part:

> The Florida Bar shall exert every reasonable effort to recover from the offending lawyer such amounts as shall have been paid to a client on any claim against such lawyer.
>
> [*Ibid.*]

The 1970 version of the same Florida rule provided in pertinent part:

> The Florida Bar or its Board of Governors may take assignments of the causes of action of claimants as a condition to said payments.
>
> [*Ibid.*]

"Any doubt about the intended scope of the Bar's recovery rights under the 1970 Rule is resolved by comparison with the former rule." *Id.* at 1223.[4] The court also found that the Florida Integration Rule permitted the Clients' Fund to subrogate the client's claim against the bank and that the subrogation action did not violate the bank's rights to equal protection or due process. *Id.* at 1223–24.

By statute the New York Legislature established a Clients' Security Fund, with the assets in the custody of the State Comptroller. *Clients' Security Fund v. Grandeau*, 72 *N.Y.*2d 62, 64, 530 *N.Y.S.*2d 775, 526 *N.E.*2d 270 (1988). In *Grandeau*, attorney Grandeau was disbarred for misappropriating funds from his clients. Grandeau's partner, Dahowski, was censured for failing to oversee the firm's record keeping but the court found that Dahowski was not responsible for the conversions. The Clients' Fund reimbursed several hundred Grandeau clients and the

---

[4] The current Florida rule provides in pertinent part:

> As a condition precedent to the grant to monetary relief, the applicant shall make an assignment in favor of the bar of the subrogation rights or of the judgment ... obtained by the applicant against the offending member or members of the bar, and the bar shall be entitled to be reimbursed to the extent of the amount of the relief granted with respect to such claim from the first moneys recovered by reason of such subrogation or assignment.
>
> [*Fla. Ct. R.* 7–2.5(a).]

clients agreed to assign and subrogate to the Clients' Fund their rights against Grandeau, Dahowski and the partnership of Grandeau and Dahowski. The governing statute permitted the Clients' Fund to recover disbursements. "The question presented on this appeal is whether the Fund is restricted to recoupment solely from the attorney who personally engaged in the dishonest conduct, or whether it may also pursue a subrogation action against the attorney's former law partner." *Id.* at 64–65, 530 *N.Y.S.*2d 775, 526 *N.E.*2d 270.

In *Grandeau* the pertinent statute permitted the Clients' Fund to condition payments upon the assignment of rights under a provision worded similarly to New Jersey's rule:

> shall require that the claimant execute such instruments, take such action or enter into such agreements as the board of trustees shall require, including assignments, subrogation agreements and promises to cooperate with the board of trustees in making claims against the attorney whose dishonest conduct resulted in the claim.
> [*Id.* at 67, 530 *N.Y.S.*2d 775, 526 *N.E.*2d 270.]

The New York highest court stated that under the traditional principles of partnership law, one partner is liable for a conversion of property committed by another member of the firm, even if that partner had no knowledge of the offending partner's actions. The court found that each aggrieved client had a viable cause of action against Dahowski and the clients assigned those rights to the Clients' Fund. "The Fund may therefore prosecute, standing in the shoes of the aggrieved clients, claims of negligence, breach of contract and breach of trust against Dahowski." *Ibid.* The court rejected Dahowski's argument that subrogation against anyone other than the defrauding attorney was not contemplated by the Legislature because Dahowski's position was "inconsistent with the statutory provisions vesting broad discretion in the Board and frustrates the purposes of the legislation creating the fund." *Id.* at 67–68, 530 *N.Y.S.*2d 775, 526 *N.E.*2d 270. The Court of Appeals elaborated: "To so limit the power of the Fund [limited to an individual who often may be bankrupt, incarcerated, or deceased and incapable of providing any refunding] would jeopardize its financial integrity and undermine its ability to promote public

confidence in the legal profession." *Id.* at 68, 530 *N.Y.S.*2d 775, 526 *N.E.*2d 270.

The history of *R.* 1:28 and the Supreme Court's dicta in *Security Title* support the Lawyers' Fund position that it is entitled to subrogate and collect from sources other than the defrauding attorney. Moreover, we find the rationale used and the conclusion reached by the two jurisdictions to address this issue, Florida and New York, are sound and persuasive.

## IV.

FFB contends that it is an "innocent" party and the Lawyers' Fund should not be able to shift this type of loss to banks. FFB does not directly address or try to refute the Lawyers' Fund's contention that, as a depositary bank, FFB is strictly liable for conversion under New Jersey's Uniform Commercial Code (UCC). Rather, FFB essentially argues, on public policy grounds, that it should not be a collateral source from which the Lawyers' Fund can seek reimbursement.

During the pendency of this case the UCC was modified. The new provisions became effective on June 1, 1995. There was some debate among the parties in the Law Division as to whether the new or the former UCC applies to this case. We conclude that under either the current or the former UCC, a depositary bank is strictly liable for paying on forged indorsements.

### A. Former UCC.

The former UCC, *N.J.S.A.* 12A:3–419, provided in pertinent part:

(1) An instrument is converted when . . .

(c) it is paid on a forged indorsement.

.  .  .  .  .  .  .  .

(3) Subject to the provisions of this Act concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one

who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

Under the former *N.J.S.A.* 12A:3–419(1)(c) a depositary bank is strictly liable for paying on a forged indorsement. There was a defense available, however, under *N.J.S.A.* 12A:3–419(3), as set out above. FFB did not claim in the Law Division and does not claim on appeal that it has a valid defense under *N.J.S.A.* 12A:3–419(3) but rather FFB simply mentions *Knesz v. Central Jersey Bank and Trust Co. of Freehold,* 97 *N.J.* 1, 477 *A.*2d 806 (1984), in which the Court applied the *N.J.S.A.* 12A:3–419(3) defense. FFB cites *Knesz* for the proposition that because it is commercially reasonable for a depositary bank to rely upon its attorney-client's veracity when depositing multiple payee instruments, the depositary bank is not at "fault." The reasoning in *Knesz* is inapplicable to this case.

There are two ways a depositary bank can be liable for paying on a forged indorsement. First, the depositary bank can be liable directly to the true owner, often the payee, for conversion as long as the *N.J.S.A.* 12A:3–419(3) defense does not apply. *See Mandelbaum v. P & D Printing,* 279 *N.J.Super.* 427, 652 *A.*2d 1266 (App.Div.1995) (no defense available under *N.J.S.A.* 12A:3–419(3) where depositary bank accepts a multiple payee check with a missing indorsement). Second, the depositary bank is liable to the drawee bank on a warranty of good title theory. *See* former UCC §§ 3–417, 4–207; *Mandelbaum,* 279 *N.J.Super.* at 435, 652 *A.*2d 1266. The *N.J.S.A.* 12A:3–419(3) defense does not operate in favor of a depositary bank as against subsequent holders. *See generally,* Janet Bergman Groue, *Forged Indorsements, Depositary Banks, and the Defense of Section 3–419(3) of the Uniform Commercial Code,* 18 Hous. L.Rev. 173, 179–180 (1980) (*Forged Indorsements*).

In *Knesz,* the attorney, Moringiella, forged his client Knesz's indorsement on the two checks and gave the checks to attorney Collins in payment of an unrelated transaction, who then deposited the checks in his firm's trust account at Central Jersey Bank, which accepted the checks with the forged indorsements and

forwarded them for collection. *Knesz,* 97 *N.J.* 1, 477 *A.*2d 806. Knesz only sued Central Jersey Bank, the depositary bank. The Court, applying the *N.J.S.A.* 12A:3–419(3) defense, found that Central Jersey Bank was not liable in the lawsuit brought by Knesz. *Id.* at 20, 477 *A.*2d 806. The Court further stated,

> That immunity may be lost, however, under certain circumstances. A depositary bank or collecting bank may become *directly liable to an owner-payee* in conversion of a forged check where it (1) acted in bad faith; (2) failed to adhere to reasonable commercial standards of banking profession applicable to such transactions; or (3) had given a provisional credit to the forger or his transferee and had not yet disbursed the entire amount of the collection proceeds.
>
> [*Id.* at 21–22, 477 *A.*2d 806 (emphasis added).]

*Knesz* only stands for the proposition that a "true owner" or payee cannot succeed in a direct action against the depositary bank alone because the drawee bank is strictly liable to the maker, and the depositary bank is strictly liable to the drawee bank on a warranty theory. But if the payee brings an action against all the banks in the chain of collection and the maker, the reasoning of *Knesz* is irrelevant. The creation of this circuitous litigation brought criticism to the former section. *See Id.* at 12, 477 *A.*2d 806; *Forged Indorsements,* 18 Hous. L.Rev. 173. Apparently, this is why the former defense available under *N.J.S.A.* 12A:3–419(c) has been eliminated in the new version of the UCC.

In *Nutt v. Chemical Bank,* 231 *N.J.Super.* 57, 62–63, 555 *A.*2d 8 (App.Div.1989), this court upheld a summary judgment against the depositary bank on the issue of liability, appropriate under the former *N.J.S.A.* 12A:3–419, where there was no dispute that an attorney forged his client's signature on a check made jointly payable to the attorney and client. In *Nutt,* we did not address *Knesz* or the defense available under *N.J.S.A.* 12A:3–419(3) because the plaintiff joined the depositary bank, the collecting bank, and the drawee bank and because the plaintiff claimed he was subrogated to the rights of the maker. *Id.* at 60, 555 *A.*2d 8. In this case the Lawyers' Fund likewise brought suit against all the banks and the makers, the insurance companies. The Law Division judge here held,

First Fidelity, as the depositary bank, is therefore primarily liable to Plaintiff if the instruments were converted. First Fidelity's liability as the depositary bank which dealt with the forger, on either a payable at or payable through draft, is primary to the liability of the Payor Banks, Collecting Banks, and Drawer–Drawees. These parties are therefore entitled to summary judgment.

Although the judge may not have had exactly the correct reasoning, the outcome is the same; because the Lawyers' Fund sued all the banks and makers, the depositary bank was ultimately and properly liable. Therefore, under the former UCC the depositary bank is strictly liable to the drawee bank, who is liable to the maker, who is in turn liable to the payee; the defense under *N.J.S.A.* 12A:3–419(3) is unavailable.

## B. The Current UCC.

Any doubt under the former UCC provision, *N.J.S.A.* 12A:3–419, that a depositary bank is liable for conversion when paying on a forged indorsement where there are two joint payees has been explicitly removed under the current *N.J.S.A.* 12A:3–420. The current UCC provides in pertinent part:

*N.J.S.A.* 12A:3–420. Conversion of Instrument.

a. The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument or a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee.

b. In an action under subsection a. of this section, the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.

c. A representative, other than a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

[*N.J.S.A.* 12A:3–420.]

"Section 3–420 is a modification of former Section 3–419." *N.J.S.A.* 12A:3–420, cmt. 1. The comments to the current *N.J.S.A.* 12A:3–420 provide in pertinent part:

The second sentence of Section 3–420(a) ... covers cases in which a depositary or payor bank takes an instrument bearing a forged indorsement. It also covers cases in which an instrument is payable to two persons and the two persons are not alternative payees, e.g., a check payable to John and Jane Doe. Under Section 3–110(d) the check can be negotiated or enforced only by both persons acting jointly. Thus, neither payee acting without the consent of the other, is a person entitled to enforce the instrument. If John indorses the check and Jane does not, the indorsement is not effective to allow negotiation of the check. If Depositary Bank takes the check for deposit to John's account, Depositary Bank is liable to Jane for conversion of the check if she did not consent to the transaction. John, acting alone, is not the person entitled to enforce the check because John is not the holder of the check. Section 3–110(d) and Comment 4 to Section 3–110. Depositary Bank does not get any greater rights under Section 4–205(1). If it acted for John as its customer, it did not become holder of the check under that provision because John, its customer, was not a holder.

. . . . . . . .

If a check is payable to more than one payee, delivery to one of the payees is deemed to be delivery to all of the payees.

. . . . . . . .

Subsection (3) of former Section 3–419 drew criticism from the courts, that saw no reason why a depositary bank should have the defense stated in the subsection. See *Knesz v. Central Jersey Bank & Trust Co.*, [97 *N.J.* 1,] 477 *A.2d* 806 (N.J.1984). The depositary bank is ultimately liable in the case of a forged indorsement check because of its warranty to the payor bank under Section 4–208(a)(1) and it is usually the most convenient defendant in cases involving multiple checks drawn on different bank.... the defense provided by Section 3–420(c) is limited to collecting banks other than the depositary bank.

[*N.J.S.A.* 12A:3–420, cmt. 1, cmt. 3.]

Because the cause of action in this case arose prior to the 1995 changes in the UCC, the former UCC version probably applies. *See Schiavo v. John F. Kennedy Hosp.*, 258 *N.J.Super.* 380, 609 *A.2d* 781 (App.Div.1992) (newly enacted statutes apply prospectively), *aff'd o.b.*, 131 *N.J.* 400, 620 *A.2d* 1050 (1993). An argument could be advanced that the changes to the UCC were merely "curative" and therefore the current provisions apply. Under either version, however, of the UCC, FFB is ultimately liable to the Lawyers' Fund.

█ FFB does not rely on *Knesz v. Central Jersey Bank and Trust Co. of Freehold,* 97 *N.J.* 1, 477 *A.*2d 806 (1984), for the proposition that it has a defense under the UCC but rather uses *Knesz* for the proposition that because it is commercially reason-

able for a depositary bank to rely upon its attorney-customer's veracity when depositing multiple payee instruments, the depositary bank is not at "fault." Even if FFB was commercially reasonable when it accepted the forged checks in this case, FFB is still strictly liable for conversion for paying on forged indorsements. It is true that FFB may not have been acting with a "culpable" mien when it accepted the forged indorsements but under the UCC the depositary bank is still liable. There is no room to allow FFB's argument that it is "innocent" to prevail. If the Lawyers' Fund was not involved, FFB would clearly be liable to the defrauded clients for converting their funds by paying on forged indorsements if the clients had sued all the banks and the makers, as was done here. Because *R.* 1:28 does not require "culpable" conduct on the part of the collateral source, FFB is an appropriate entity from which the Lawyers' Fund can seek reimbursement.

FFB attempts to distinguish *Security Title*, 134 *N.J.* 358, 634 *A.*2d 90 (1993), on three grounds: (1) in that case the attorney represented not only the buyer but the title company as well; (2) the title insurer expressly undertook the risk of theft by the attorney through the closing-protection letter; and (3) embezzlement of closing funds is an obligation implicit in title insurance. Essentially FFB is urging that *Security Title* stands for the proposition that the Lawyers' Fund can only seek reimbursements from "collateral sources" which are "not innocent" or which explicitly undertake the risk of loss. But *R.* 1:28 does not distinguish between morally "innocent" and "culpable" collateral sources; we will imply no such aura to the rule.

We find the balance of FFB's argument: (1) lack of proximate cause; (2) failure to maintain a direct action against the bank; and (3) ratification by Lawyers' Fund, clearly without merit. *R.* 2:11–3(e)(1)(E).

## V.

The historical textual changes to *R.* 1:28 support the conclusion that the Lawyers' Fund currently has the right to pay a claimant

before that claimant pursues collateral sources and then can, as subrogee or assignee of the claimant, pursue those collateral sources. This system avoids making defrauded clients engage in extensive litigation to recoup their losses. This efficient philosophy has been alluded to by the Supreme Court and adopted by other jurisdictions which have similar client funds. We affirm Judge Shuster's finding that the Lawyers' Fund has a right to subrogate against collateral sources other than the defrauding attorney.

Under the former and the current versions of the UCC a depositary bank is strictly liable for paying on forged indorsements. In this case, if the claimants had pursued a legal action against FFB they would have prevailed because there was no factual dispute that the checks were forged and FFB accepted and paid under the forged indorsements. FFB is an appropriate collateral source to reimburse the Lawyers' Fund.

Affirmed.