IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 25, 2007 Session

**BRIAN E. HARRIS, M.D. v. PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, ET AL.**

**Appeal from the Circuit Court for Hamilton County
No. 04-C-609     Jeff Hollingsworth, Judge**

**No. E2007-00157-COA-R3-CV - FILED APRIL 30, 2008**

Dr. Brian E. Harris ("Doctor"), the insured, brought this action for breach of contract and on the basis of various torts. He alleged that UnumProvident Corporation ("Insurance Company" or "the company") had wrongfully canceled his disability policy and retroactively rejected his disability claim. The trial court granted Insurance Company summary judgment. The court found that Doctor had filed his suit outside the applicable limitations periods. Doctor appeals, claiming that his suit was timely filed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. and SHARON G. LEE, J., joined.

Thomas O. Sinclair, Birmingham, Alabama, and Stephen A. Marcum, Huntsville, Tennessee, for the appellant, Brian E. Harris, M.D.

Steven A. Riley, Katharine R. Cloud, and Amy J. Everhart, Nashville, Tennessee, and Scott N. Davis, Chattanooga, Tennessee, for the appellees, Provident Life and Accident Insurance Company, UnumProvident Corporation, and Provident Life and Casualty Insurance Company.

**OPINION**

I.

Doctor, an internal medicine physician, purchased two disability insurance policies from Insurance Company in 1995. One policy was a "disability income policy," to cover lost personal income; the other, an "overhead expense disability policy," to cover business expenses related to

Doctor's medical practice in the event of his disability. Both policies[1] contain the following provisions relative to the disposition of this case:

PROOF OF LOSS
If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.

If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.

* * *

LEGAL ACTIONS
You may not start a legal action to recover on this policy within 60 days after you give us required proof of loss. You may not start such action after three years from the time proof of loss is required.

* * *

CONFORMITY WITH STATE STATUTES
Any provision of this policy which, on its effective date, is in conflict with the laws of the state in which you reside on that date is changed to conform to the minimum requirements of those laws.

(Capitalization in original). Doctor was a resident of New Jersey when the policies became effective on January 11, 1995.

As part of his application for benefits under the policies, Doctor signed and submitted a medical questionnaire on which he asserted, among other things, that he had not, "within the past 5 years, had medical or surgical advice or treatment, . . . a physical examination, or been under observation for any disease or disorder"; that he did not have a personal physician; and that he was not "under observation or taking treatment."

In November 1998, Doctor filed a claim under both policies for what he described as a "disability [that] began in [February 1997] due to toxicity from an overdose of ill prescribed

---

[1] The quoted provisions are from the disability income policy. The applicable provisions in the overhead expense disability policy are worded slightly differently, but are substantively the same.

medication named Prednisone." He asserted that he "was fine with no problem until this treatment was recommended[.]" The treatment, he said, led to avascular necrosis, which caused him to be "literally unable to walk from April 1997 to August 1998 and . . . unable to practice full-time." The "residual and ongoing disability" caused by the avascular necrosis was continuing to cause him difficulty, he wrote. He added that it harmed his medical practice and reduced his income.

Insurance Company approved the claim in May 1999, and thereafter paid a total of $168,224.76 in benefits on it between May 1999 and November 2000. Then, on November 29, 2000, Insurance Company sent a letter to Doctor, stating that it was rescinding the policies because of information contradicting Doctor's assertions on his applications that he had no prior medical problems.[2] "You answered in the negative to all of the medical questions on the applications," Insurance Company's letter pointed out. The letter also stated as follows: "The company, in accepting your application for insurance, relied upon the accuracy and completeness of [those medical history statements] in order to issue these policies to you. . . . Had our company been aware of your medical history we would have not approved the issuance of these Policies." The company further asserted that "since the policy is null and void, we have no liability under your claim" and demanded that Doctor repay the $168,224.76 in benefits that he had received. The letter concluded as follows:

> If you would like to submit additional information for further consideration of your claim, please send it to my attention [at the Customer Care division]. If you have no new information to provide but would like to appeal our determination, please send a written request for review to [the Quality Performance Support division] . . .
>
> \* \* \*
>
> Your written request should include your comments and views of the issue[s] you wish [Insurance Company] to consider. If [the company] does not receive the written request within 90 days of the date of this notice, we will assume you agree with our determination.

Attached to Insurance Company's letter were two checks purporting to refund to Doctor $9,070 in premiums that he had paid since 1995. The letter stated that "[t]he negotiation of the enclosed checks will be construed as your acknowledgement that the policies . . . [are] null and void." The checks themselves also stated on the front: "DL ENDORSEMENT ACKNOWLEDGES THAT POLICY . . . IS RESCINDED. AMOUNT PAID IS FULL REFUND OF ALL PREMIUMS." (Capitalization in original.) Doctor cashed the checks on December 18, 2000.

---

[2] Because the specific nature of the information that prompted this decision is not central to the dispute on appeal, we will not discuss it in any detail.

After cashing the checks, Doctor wrote to Insurance Company's Quality Performance Support division on December 20, 2000. He began his letter by stating, "[t]hank you for allowing me to respond to the letter of November 29, 2000 which cancels my policy." He then proceeded to defend his answers on the applications and attempted to discount or explain the evidence that appears to contradict those answers.[3] He also pointed out that "the information that you are bringing to my attention [purporting to contradict the applications] was available before the claim was made and certainly before benefits were paid in May of 1999." He concluded: "I ask that you favorably review this matter and please reinstate my policy as my profit and loss statements indicate that I will not be able to repay the benefits and will not be able to pay my living expenses as I have had several months of negative cash flow."

Insurance Company replied on March 26, 2001. Its letter stated that an "appellate review" had been conducted, and "we have concluded that the determination made to rescind both of the above-referenced policies was appropriate. We are upholding that determination." The letter proceeded to explain the decision in detail, responding to each of Doctor's points. Having done this, the letter then stated, "[a]lthough we took the time to review this determination, it appears that our review was not necessary" because Doctor endorsed and cashed the refund checks "two days before you even wrote your letter appealing the rescission determination. By cashing these checks, you acknowledged that both of your policies are rescinded, null and void, and are considered to have never been issued." (Formatting omitted.) The letter concluded:

> As was explained in our letter of November 29, 2000, since your policies are null and void, we have no liability under your claims. You were previously provided a total of $168,224.76 in benefits under your policies. These benefits should not have been paid, and are owed to our company.
>
> Dr. Harris, we have now completed a full and fair appellate review of the determination made to rescind both of your policies. We have concluded that the determination was appropriate and we have upheld that determination. You have acknowledged that both of your policies are rescinded and are no longer in force. You have done this by cashing both of the premium refund checks. We are sorry that this determination had to be made with regards to both of your policies. However, we trust you can understand and appreciate how our company came to this conclusion. Please notify us within 30 days of the date of this letter regarding how you intend to repay to our company the benefits previously paid to you under these policies.

---

[3] Again, we need not discuss these factual matters in detail, except to point out that Doctor went into considerable detail in arguing the various relevant issues.

-4-

Unlike the company's November 29, 2000, letter, the March 26, 2001, letter contained no language regarding an appeal or a process for submitting additional information, aside from the request for notification of how Doctor intended to repay the $168,224.76 in benefits received.

Despite the apparent finality of Insurance Company's March 26, 2001, letter, Doctor wrote back on April 15, 2001 and further challenged the decision. He wrote that "the demand for the $168,000.00 . . . is inappropriate" and then proceeded to "reiterate" many of the same arguments that he had earlier raised in his December 20, 2000, letter and that the company had already rejected. Although the company's three-page letter of March 26, 2001, had addressed each of his arguments in considerable detail, Doctor stated in his April 15, 2001, letter that his "concerns . . . were obviously totally ignored" by the appellate review board – said "obvious[ness]" arising, presumably, from the fact that his appeal was rejected. He further argued that "[c]ustomer care was totally inaccurate in its decision, and it was inappropriate to rescind my policy." He accused Insurance Company of "making this decision [that his prior medical conditions warranted denial of his applications] in hindsight after there was a disability." He then recited his dire financial straights and concluded:

> Unfortunately, I am unable to make any payment at this time even if I wanted to. However, let it be perfectly clear that I view the actions of [Insurance Company] as totally inappropriate, insensitive, and unnecessary. I disagree with the assumption that the underwriting would not have covered me. I also state clearly that it is [Insurance Company]'s fault that they rendered benefits to me. All the information that they are now [using to assert that the applications were inaccurate] was available in late 1997 and after my surgery in May of 1998, and again they made benefits retroactive, so they must have had documentation from early 1997 with all of the things again challenged. I will not be making any payments for those reasons.

> If this could be further arbitrated, as I believe I did not [get] a fair chance to present my information, or if another solution can be arranged, I would gladly be willing to listen.

Insurance Company replied on May 9, 2001. As will be seen, one of Doctor's key arguments is that the May 9, 2001, letter, rather than the November 29, 2000, letter or the March 26, 2001, letter, represented the *first notice* to Doctor that the company had reached a *final* decision to rescind his policies, thus triggering his cause of action for limitations purposes. The May 9, 2001, letter responded in detail to the issues raised – or rather, re-raised – by Doctor in his April 15, 2001, letter. After two pages of such point-by-point rebuttals, the May 9, 2001, letter then stated:

> Please be advised, upon complete review of this situation, and given your current financial situation; in an effort to resolve this dispute, we are willing to forgive the overpayment, as your policies have been

-5-

rescinded and we wish to part ways amicably. **This willingness to forgive the overpayment should not be construed in any way as an acceptance of liability for benefits paid for that period of time.** We remain of the opinion that you did not disclose to us significant historical medical information on your application for coverage, and that, had we been made aware of your medical history, we would not have issued your policies. As such, we remain of the opinion that the $168,224.76 in benefits provided to you under your two policies were provided erroneously and should not have ever been provided. We remain of the opinion that we have a right to pursue repayment of those monies. However, given our belief that it is unlikely that we will be able to recover a significant portion of that money, given your current financial situation, we are making a business decision to forgive that overpayment.

We trust you are pleased with our willingness to forgive this overpayment. We consider this issue now closed. If you should have any final questions, please feel free to contact me.

(Formatting in original.)

Doctor filed this lawsuit on April 13, 2004 – three years and 136 days after the November 29, 2000, letter, and three years and 18 days after the March 26, 2001, letter, but two years and 340 days after the May 9, 2001, letter. The trial court held that, "[l]ooking at the evidence in the light most favorable to [Doctor], the absolute latest event which could be construed as notice of [Doctor]'s claim is" the March 26, 2001, letter.[4] The court therefore granted Insurance Company's motion for summary judgment on the ground of untimeliness. The court held that Doctor's contractual claims were barred by the three-year limitations period contained in the policies, and that Doctor's related tort claims were barred by Tennessee's three-year statute of limitations for property torts, Tenn. Code Ann. § 28-3-105 (2000).[5] Doctor appeals, claiming that his action was commenced within three years because he did not have notice of Insurance Company's "final decision" until May 9, 2001, and that, in any event, New Jersey's six-year statute of limitations trumps the policies' three-year limit because of the "conformity with state statutes" clause in the policies. Doctor also argues that his tort claims did not necessarily accrue on the same date as his contract claims, and that Insurance Company did not prove the tort claims were untimely. In addition, he raises equitable arguments that we will address in the course of discussing his other claims.

---

[4]The court's opinion refers inconsistently to the date of this letter as either March 16, 2001, or March 26, 2001. It is clear, however that the references to March 16 are the result of a clerical error. The actual date is March 26.

[5] This section was erroneously cited by the trial court as Tenn. Code Ann. § 29-3-105.

II.

In deciding this case, the trial court properly utilized New Jersey substantive law and Tennessee procedural law. "In the absence of an enforceable choice of law clause, Tennessee courts apply the substantive law of the state in which [an insurance] policy was issued and delivered." *Standard Fire Ins. Co. v. Chester O'Donley & Assoc.*, 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998). In the instant case, that state is New Jersey. However, the lawsuit was filed in Tennessee; therefore Tennessee procedural law applies. *Id.*

Our standard of review on a grant of summary judgment is well-settled. "Our inquiry involves purely a question of law; therefore, we review the record without a presumption of correctness to determine whether the absence of genuine issues of material facts entitle the defendant to judgment as a matter of law." *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). "Tenn. R. Civ. P. 56.03 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (citations omitted). The moving party, in this case Insurance Company, has the initial burden, and "must either affirmatively negate an essential element of the non-movant's claim or conclusively establish an affirmative defense." *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998). Only if the company has succeeded in this task is Doctor required to produce evidence to support his position.

III.

A.

We will begin with Doctor's contention that his contractual claims did not accrue until sometime on or after April 13, 2001, *i.e.*, three years prior to the date he filed suit. There are several ways of approaching this issue. One approach would be to focus on Doctor's cashing of the refund checks, which was arguably an implicit acceptance of the policies' rescission, or on the opening line of his December 20, 2000, letter, which stated, "[t]hank you for allowing me to respond to the letter of November 29, 2000 *which cancels my policy*." (Emphasis added.) Under this approach, the three-year "clock" began ticking on either December 18, 2000, or December 20, 2000. In either case, Doctor would have been too late in filing his lawsuit on April 13, 2004.

Another possible approach is to focus on the literal terms of the policies' limitations clauses, which state, "[y]ou may not start a legal action to recover on this policy . . . after three years from the time proof of loss is required." Under the general "proof of loss" clauses in the policies and the specific terms of the company's November 29, 2000, letter, both of which are quoted earlier in this opinion, it is clear that "proof of loss [was] required" within 90 days after November 29, 2000, which would be February 27, 2001. This would mean that Doctor was required to file suit on or before February 27, 2004. Under this scenario, he would again miss the deadline.

Not surprisingly, Doctor eschews both of these approaches, and instead relies on the

> general rule . . . that "[t]he limitation begins to be effective from the time the right of action accrues, notwithstanding the expression 'after the [loss].' " ***Das v. State Farm Fire and Cas. Co.***, 713 S.W.2d 318, 323 ([Tenn. App.] 1986) . . . A plaintiff 's cause of action accrues when the insurer denies liability.

***Beasley v. State Farm Fire & Cas. Co.***, No. 2:04 CV 02853, 2005 WL 1239401, at *2 (W.D. Tenn., filed May 24, 2005). Yet even under this approach, Doctor's position must fail.  He argues that Insurance Company did not announce a final denial of liability until its May 9, 2001, letter, and thus Doctor's claim did not accrue until that date, which would mean that his April 13, 2004, complaint was timely filed.  Factually, however, this argument is without merit.

Insurance Company informed Doctor on November 29, 2000, that it was rescinding his policies, and Doctor arguably acquiesced in this action by cashing the two refund checks despite unambiguous and prominent language indicating that he was thereby accepting the rescission of his policies.  As already noted, this action on his part arguably terminated the company's invitation to Doctor to "submit additional information for further consideration of your claim . . . [or] appeal our determination."  However, although Doctor appealed Insurance Company's determination only *after* cashing the refund checks, the company nevertheless conducted a full appellate review, after which it explained its decision, addressing each of Doctor's arguments in great detail, in the March 26, 2001, letter.  That letter states unambiguously that "we have *now completed* a full and fair appellate review of the determination made to rescind both of your policies" (emphasis added) and have "concluded that the determination was appropriate and we have upheld that determination."

Unlike the November 29, 2000, letter, the March 26, 2001, letter did not leave the matter open for appeal.  The only additional information requested from Doctor was an explanation of "how you intend to repay to our company the benefits previously paid to you under these policies." Somewhat incredibly, Doctor now attempts to use *that* language as support for his contention that the letter was not a "final decision" that triggered the running of the limitations period on his cause of action.  Doctor suggests that because Insurance Company asked him to reply to its March 26, 2001, letter, the decision was not yet final.  Yet, as can be seen, Insurance Company was most assuredly *not* inviting Doctor to continue appealing a decision that the company had already, in its words, "completed a full and fair appellate review" of.  The company was asking Doctor for a payment plan, not additional argumentation.  The fact that Doctor instead responded with additional argumentation – and that the company elected to give him yet another detailed response – does not somehow suggest that Doctor's unsolicited second appeal was a sign that he had, in his words, "accepted the [company's] offer to engage in administrative remedies in the hopes of resolving this dispute."  As far as Insurance Company was concerned, the "dispute" was already over, as it had told Doctor in no uncertain terms by its correspondence of March 26, 2001.

Moreover, Insurance Company's decision to forgive Doctor's debt did not re-open the underlying question of whether the policies were properly rescinded.  The May 9, 2001, letter left

no doubt about this point, stating in boldfaced and underlined text that the company's "willingness to forgive the overpayment should not be construed in any way as an acceptance of liability for benefits paid for that period of time." The company had, after all, already "completed" its appellate review of that issue and concluded that it was *not* liable for those benefits. Right or wrong, that was unequivocally Insurance Company's final decision; the company never wavered on that point. Thus, the *only issue* still unresolved after the March 26, 2001, letter was the question of Doctor's repayment of the already-received benefits, and there is no logical reason to conclude that Doctor's underlying cause of action did not accrue until this related but different issue had been resolved. Any such line of reasoning would necessarily lead to the conclusion that, if Insurance Company had *not* forgiven Doctor's debt, and if Doctor had been unwilling or unable to pay, his cause of action against the company for rescinding his policies would *never* have accrued so long as the parties' subsidiary dispute over repayment had remained unresolved. Such a view is entirely untenable. The operative question is when Doctor received final notice that *his policies had been rescinded*, not when he received final notice of how Insurance Company intended to proceed with regard to the resulting debt. These are logically distinct questions, and Doctor's attempt to fuse them into a single question is not well taken.

Doctor makes much of Insurance Company's statement in the May 9, 2001, letter that "[w]e consider this issue now closed." Doctor argues that this wording necessarily implies that the "issue" of his appeal, as a whole, was not "closed" prior to May 9, 2001. Yet a fair reading of the letters between Doctor and Insurance Company makes it abundantly clear that the "issue" in question was really comprised of two issues, one relating to the policies' rescission and the other relating to Doctor's repayment. To reiterate, the March 26, 2001, letter left no doubt that Insurance Company considered the rescission issue "closed" as of March 26, 2001; the only issue still unresolved was the matter of Doctor's repayment. Insurance Company's "business decision" to forgive Doctor's debt resolved that particular issue, which in turn meant that the whole "issue" of Doctor's dispute with Insurance Company could finally be described as "closed," in its entirety, as of May 9, 2001. That language in no way implies, however, that every aspect of the "issue" had remained open and unresolved until May 9, 2001.

Simply put, there is no reasonable interpretation of these undisputed facts that can support the conclusion that Insurance Company did not finally reject Doctor's claim, and give Doctor notice of that rejection, until its letter of May 9, 2001. As the trial court stated, the last possible point at which Doctor can plausibly argue that his claim accrued is upon receipt of the company's March 26, 2001 letter. Thus, his April 13, 2004, complaint was not filed within three years of the claim's accrual.

B.

Relatedly, Doctor also argues that, under New Jersey's equitable tolling doctrine – which he claims is substantive, not procedural, and thus applicable to this case – the limitations period should be deemed tolled until May 9, 2001, because the exchange of letters between Doctor and Insurance Company had the effect of stringing Doctor along and "lulling" him into delaying his lawsuit. We

need not reach the legal question of whether this doctrine even applies, because the facts so plainly do not support the theory. The record indicates that, if anyone was stringing anyone else along, it was Doctor, who continued to appeal his policies' rescission even after he had been told that the company's decision was final and no further appeals were possible. The company's March 26, 2001, letter provided Doctor with a clear, final answer, and requested information solely on how he intended to repay his debt. The fact that Doctor nevertheless persisted in arguing his case does not somehow suggest that the *company* was dragging out the controversy. Nor is it remotely reasonable to hold that the company undermined the finality of its March 26, 2001, decision by responding in detail on May 9, 2001, to the arguments that Doctor had chosen to rehash in his April 15, 2001, letter. It would be absurd and perverse to effectively penalize Insurance Company for *repeating* in detail, in its May 9, 2001, letter, the reasons for the final judgment that had been rendered on March 26, 2001. A final decision does not become less final merely because the decider restates its rationale multiple times in response to multiple redundant challenges. For this reason, we find no equitable basis for forgiving the untimeliness of Doctor's claim.

Moreover, even if Insurance Company could somehow be faulted for lulling Doctor into inaction – and, again, we think such a conclusion would be erroneous on these facts – the most Doctor can possibly claim, even under his version of events, is that he "only" had *2 years and 11 months* in which to file his claim. If this were true, it would hardly be a significant injustice similar to the "lulling" that has triggered the application of the equitable tolling doctrine in other cases. *See, e.g.*, **Peloso v. Hartford Fire Ins. Co.**, 267 A.2d 498, 502 (N.J. 1970) (if statute of limitations had not been tolled during nine-month negotiation period, Plaintiff's 12-month window in which to file suit would have been reduced to 3 months). Even if Doctor somehow did not realize he had a cause of action based on the March 26, 2001, letter, the brief delay until May 9, 2001, would have caused him no significant prejudice. Doctor argues that, "[a]s a result of [his] reasonable reliance on this lack of a formal denial of his claim [until May 9, 2001], [Doctor] continued to negotiate with [Insurance Company] *and did not institute this action until April 2004*." (Emphasis added.) This court does not follow Doctor's logic. He had *plenty* of time between May 9, 2001, and April 13, 2004, in which to file a timely claim, and he can hardly blame Insurance Company for his failure to do so. This emphatically is *not* the sort of case where, absent equitable relief, "[the] limitations period [would] . . . 'become a[n] instrument of injustice.'" **Price v. New Jersey Mfrs. Ins. Co.**, 867 A.2d 1181, 1186 (N.J. 2005) (quoting **Procanik by Procanik v. Cillo**, 478 A.2d 755, 762 (N.J. 1984)). There is no inequity here, so equitable relief would be inappropriate even if it were otherwise legally and factually supportable.

IV.

A.

We turn next to Doctor's contention that the three-year contractual limitations period should not apply because it conflicts with New Jersey's six-year statute of limitations for contract claims, and therefore is superseded by that statute under the policies' "conformity with state statutes" clause. That clause states: "Any provision of this policy which, on its effective date, is in conflict with the

laws of the state in which you reside on that date is changed to conform to the minimum requirements of those laws."

This argument is without merit because there is no inherent "conflict" between a longer statute of limitations and a shorter contractual limitations period. A statute of limitations is a maximum, not a minimum. *See* N.J. Stat. Ann. § 2A:14-1 ("Every action . . . for recovery upon a contractual claim . . . shall be commenced *within* 6 years next after the cause of any such action shall have accrued"). (Emphasis added). If the policies had provided for a limitations period *longer* than six years, that would be a true conflict with the statute's "within" language. Parties are free, however, to contract for a *shorter* period, unless a statute specifically forbids them from doing so. Thus, in, *Smith v. Allstate Ins. Co.*, No. 92364-Q, 1987 WL 30150 (Tenn. Ct. App. W.S., filed December 30, 1987), this court upheld a one-year contractual limitations period in spite of a conformity clause – substantively identical to the conformity clause in the instant case – which stated that "[w]hen the policy provisions are in conflict with the statutes of the state in which the residence premises is located, the provisions are amended to conform to such statutes." The court reasoned as follows:

> For almost one hundred years contractual periods of limitation in insurance contracts having the effect of reducing the statutory period for filing suit have been upheld. *Guthrie v. Connecticut Indemnity Association*, 101 Tenn. 643, 49 S.W. 829 (1899); *Tullahoma Concrete Pipe Co. v. Gillespie Construction Co. & United States Fidelity & Guaranty Co.*, 56 Tenn.App. 208, 405 S.W.2d 657 (1966); *Hill v. Home Insurance Co.*, 125 S.W.2d 189 (Tenn.App.1938).
>
> \* \* \*
>
> *While the limitation period as provided for in the policy is different from that provided for by the statutes of this state, they are not "in conflict".* The law in Tennessee is simply to the effect that absent an agreement to the contrary, any aggrieved party has six years to sue for the enforcement of a contract. The crux of the holding of the above-cited cases is to the effect that parties may contract themselves out of the six-year period, and this is what has taken place here.

*Id.*, at \*1 (emphasis added). This point is settled law in both New Jersey and Tennessee. *See, e.g., Eagle Fire Protection Corp. v. First Indem. of America Ins. Co.*, 678 A.2d 699, 704 (N.J. 1996) ("[c]ontract provisions limiting the time parties may bring suit have been held to be enforceable, if reasonable"); *Brick Church Transmission, Inc. v. Southern Pilot Ins. Co.*, 140 S.W.3d 324, 329 (Tenn. Ct. App. 2003) ("Tennessee has long held that an insurance policy provision establishing an agreed limitations period within which suit may be filed against the company is valid and enforceable").

The Tennessee case cited by Doctor in support of his argument, ***Corroon & Black Ben., Inc. v. Lexington Ins. Co.***, No. 01A01-9010-CH-00369, 1991 WL 122881 (Tenn. Ct. App. W.S., filed July 10, 1991), is readily distinguishable.  The court in ***Corroon*** held that a three-year contractual limitations provision was superseded by the six-year Tennessee statute of limitations because of a "Conformity With State Statutes" clause that stated:

> If *any time limitation of this Policy* with respect to giving notice of claim or furnishing proof of loss or bringing action is *less than that permitted by* the law of the state in which the Named Insured resides, such limitation is hereby extended to agree with the minimum period permitted by such law.

(Emphasis added.)  As can be seen, the conformity clause in ***Corroon*** specifically states that the limitations period ("any time limitation of this Policy") will be extended if it is "less than that permitted by" state law.  In the instant case, on the other hand, the conformity clause is far more generic, referring generally to "conflicts" between *any* state statute and *any* contractual provision:

> *Any provision* of this policy which, on its effective date, is *in conflict* with the laws of the state in which you reside on that date is changed to conform to the minimum requirements of those laws.

(Emphasis added.)  The use of the word "conflict" is crucial.  The policies in the instant case state that the conformity clause applies only in the event of a "conflict" with a statute.  In ***Corroon***, by contrast, the test was not whether a "conflict" existed, but whether the contractual limitations period was "less than that permitted" by state law.  Because three years is "less than" six years, the conformity clause in ***Corroon*** controlled.[6]  In the instant case, however, that is not enough.  There needs to be a "conflict" to trigger the conformity clause, and there is none.  Nor is there any ambiguity present.  The policies clearly state that a three-year limitations period applies, and – unlike in ***Corroon*** – the generic terms of the "conformity with state statutes" clause cannot be fairly construed as contradicting that specific limitations language.  We therefore affirm the court's determination that Doctor's contractual claims are governed by the policies' three-year limitations period, not New Jersey's six-year statute of limitations.

---

[6]We recognize that an alternative reading of ***Corroon***'s "less than that permitted" language is possible.  Under this interpretation, it is argued that the ***Corroon*** court implicitly endorsed the view that the six-year statute of limitations is a minimum period, rather than merely a maximum.  However, notwithstanding the reference in the ***Corroon*** contract to a statutory "minimum period," we do not believe that the ***Corroon*** court intended to effectively overturn – without explicitly saying so – the long settled precedent that contractual limitations periods are valid.  We therefore reject this interpretation of ***Corroon***, and, in any event, we reiterate our holding that the statute of limitations is a maximum, not a minimum, and therefore there is no inherent conflict between a *longer* statutory limitations period and a *shorter* contractual limitations period.

-12-

B.

As an alternative ground for ignoring the policies' three-year limitations period, Doctor argues that Insurance Company should not be allowed to avoid liability on the basis of a limitations period contained within the very contract that, according to Doctor, the company breached. This is the doctrine of first material breach, but its applicability on these facts would quite literally eviscerate the entire concept of contractual limitations periods, which, as we just noted, have long been held valid in both Tennessee and New Jersey. The mere fact that Doctor *claims* Insurance Company breached the contract does not entitle him to cite that *claimed* breach as a ground for preventing the company from relying on the limitations period. If it did, then no limitations period in any contract would have any practical effect, since the limitations period is not relevant unless and until someone claims a breach. This point is nicely illustrated by the concluding paragraph of Doctor's own argument on this issue:

> It should be noted that an important question of material fact must be answered before any decision can be reached on this issue: Did [Insurance Company] breach the contract by failing to pay [Doctor] in accordance with the policy? [Doctor] asserts it did; [the company] asserts it didn't. This disputed material fact makes summary judgment inappropriate.

Essentially, Doctor is arguing that a trial on the merits of his breach of contract claim is necessary to determine whether the contractual limitations period can be applied. Again, if this were so, it would entirely defeat the purpose of such limitations periods.

The case cited by Doctor in support of his argument, ***Warren v. Employers' Fire Ins. Co.***, 250 A.2d 578 (N.J. 1969), is inapposite because the defendant in that case *admitted* it had liability on the contract. In the instant case, Insurance Company makes no such admission. The doctrine of first material breach therefore does not bar the company from relying on the limitations period to avoid a trial on the merits of Doctor's claims. If Doctor wished to *prove* his *claim* that Insurance Company committed a breach of contract, he needed to file suit within three years after his cause of action accrued. He failed to do so.

For all of the foregoing reasons, we hold that the three-year contractual limitations period is applicable to these facts and bars Doctor from seeking recovery on the policies.

V.

That brings us, finally, to Doctor's non-contract claims. Specifically, in addition to breach of contract, Doctor sued for bad faith, fraud, suppression, misrepresentation, conspiracy and violation of a New Jersey consumer protection statute.

-13-

Contrary to Doctor's claim that the trial court improperly dismissed all of these claims on the basis of the contractual limitations period, the trial court's order states quite clearly that "[Doctor]'s fraud, suppression, misrepresentation, conspiracy and New Jersey Consumer Protection Act claims are all torts and subject to Tennessee's three year statute of limitation [for property torts, Tenn. Code Ann. § 28-3-105]." The trial court did interpret Doctor's claim for bad faith as contract-based and therefore subject to the policies' three-year limitations period. This issue is of no consequence, however, because all of Doctor's claims are subject to a three-year limitations period, regardless of whether that period is imposed by statute or contract.[7] The only real dispute is over timing: specifically, whether the limitations period on Doctor's tort claims began to run at the same time as it did on his contractual claims.

Doctor argues that Insurance Company, in pleading the affirmative defense of untimeliness, has failed to prove that Doctor's "fraud based claims" – by which Doctor apparently means his claims for fraud, suppression, misrepresentation, conspiracy and violation of the New Jersey consumer protection statute – arose prior to April 13, 2001, *i.e.*, three years before he filed suit. Indeed, Doctor's reply brief asserts that "[t]he record is devoid of <u>any</u> evidence of when Dr. Harris discovered his fraud based claims." (Underlining in original.) The company has, according to Doctor, "presented <u>no</u> evidence that Dr. Harris discovered or should have discovered his cause of action for <u>fraud</u> on the same day when their 'final decision' was rendered." (Underlining in original.) Insurance Company, for its part, notes that "[a]lthough [Doctor] includes in certain of his tort claims broad and generic accusations of 'fraud,' 'suppression' and the like, the only factual allegations he cites in his complaint in support [of] each of these claims is [the company's] rescission of the policies and termination of [Doctor's] benefits."

Doctor now argues that a document drafted by Insurance Company's attorneys, referred to as "the LeBoeuf Report," is central to Doctor's tort claims. The document, according to Doctor, "outlines the method and manner by which [the company] perpetrated the fraud in this case." Indeed, Doctor states in his reply brief that Insurance Company's "campaign that *forms the basis* of [Doctor's] fraud based claims of fraud, suppression, misrepresentation, conspiracy and New Jersey Consumer Protection Act claims (counts 3, 4, 5 and 6 in the complaint), is set out in writing by the report to [Insurance Company] from the law firm of Lebouf [sic], Lamb, Greene & MacRae, L.L.P." (Emphasis added.) However, if the details alleged in the LeBoeuf Report "form the basis" of Doctor's "fraud based" claims, they are curiously absent from his complaint. The factual "basis" asserted in Doctor's complaint is quite different, and appears to hinge entirely on the simple fact that Insurance Company failed to make payments on his policies after promising to do so. The complaint states as follows with regard to count three, for fraud:

> 56. Plaintiff purchased disability policies from Defendants in or
> about January of 1995. Specifically, [Insurance Company] issued a

---

[7] Insurance Company's argument that Doctor's claim under the New Jersey consumer protection statute should be governed by the contractual limitations period, rather the Tennessee statute of limitations, is likewise of no consequence. Again, the applicable limitations period is three years, regardless of its legal basis.

Disability Income Policy in the name of Brian E. Harris, M.D., the insured, Policy No. 36-337-6115579, and an Overhead Expense Disability Policy in the name of Brian E. Harris, M.D., the insured, Policy No 36-1737-6115582. The effective date of both policies was January 11, 1995.

57. Prior to and at the time of issuance of the policies, and thereafter until said policies were wrongfully rescinded, Defendants represented to the Plaintiff that, in exchange for payment of the required premiums, Defendants would provide Plaintiff with disability policies that would pay monthly disability benefits in the event the Plaintiff were to become disabled and was unable to perform the duties of his occupation while said disability policies were in-force.

58. In or around 1997, Plaintiff initiated a claim, the final application for which was completed in late 1998. Following the submission of his claim, Defendants began making payments to the Plaintiff under the disability policies.

59. Plaintiff continued to receive his benefits under the policies until the benefits were wrongfully denied in December 2000.

60. Plaintiff's decision to initiate policies with the Defendants and to maintain them thereafter were based in reasonable reliance upon Defendants' representations regarding their commitment to honor the terms of the policies and to pay any benefits that might come to be due the Plaintiff.

61. Defendants entered into a pattern and practice of fraudulent conduct and conspired and cooperated with one another in committing the frauds practic[ed] on the Plaintiff, and other insureds, by denying benefits that were due to be paid.

62. The representations made by Defendants to the Plaintiff in order to induce him into entering into, and then maintaining, the policies of insurance at issue herein were false, were known by the Defendants to be false at the time they were made, and were made with the intent to lead the Plaintiff to rely on said misrepresentations and fraud to his detriment and to Defendants' benefit.

63. As a direct and proximate result of Defendants' wrongful acts and omissions and fraudulent conduct as previously alleged herein,

Plaintiff has suffered and continues to suffer substantial damages as alleged above.

The only language in the complaint for fraud that arguably foreshadows Doctor's later claims *vis a vis* the LeBoeuf Report is found in paragraph 61, which asserts the existence of "a pattern and practice of fraudulent conduct" resulting in a conspiracy to "commit[] the frauds practic[ed] on the [Doctor], and other insureds, by denying benefits that were due to be paid." Yet this is all conclusory language, with the exception of the final clause: "by denying benefits that were due to be paid." That is the only *fact* alleged in paragraph 61, and it does not appear to be an actual claim of fraud, but rather a mislabeled repetition of Doctor's contract claim.

"Allegations of fraud must be plead with particularity." ***Kincaid v. SouthTrust Bank***, 221 S.W.3d 32, 41 (Tenn. Ct. App. 2006); *see also* Tenn. R. Civ. P. 9.02 (2007). "A claim of fraud is deficient if the complaint fails to state with particularity an intentional misrepresentation of a material fact." ***Kincaid***, 221 S.W.3d at 41. The only misrepresentation alleged by Doctor is his claim that Insurance Company promised, "in exchange for payment of the required premiums, . . . [to] provide [Doctor] with disability policies that would pay monthly disability benefits in the event the [Doctor] were to become disabled." In other words, they promised to honor his insurance policies, a promise that they never intended to keep, according to Doctor. Even if this is a proper allegation of fraud, which we doubt, it is difficult to see how Doctor can claim that he became aware of this "fraud" at some later date than March 26, 2001, when the company announced that it did not intend to honor his policies.

This conclusion also holds true with regard to counts four through seven[8], for suppression, misrepresentation, conspiracy and violation of New Jersey consumer protection statutes. These counts make essentially the same allegations as count three for fraud. The suppression count contains language similar to paragraph 61 in the fraud count, as it asserts that Insurance Company "maintained an undisclosed, secret corporate policy in place aimed at postponing and denying claims and benefits regardless of whether same claims were meritorious and due to be paid." Yet, much like the alleged conclusion – "pattern and practice" – in the fraud count, this supposed secret policy is not truly the *basis* of Doctor's complaint, but rather a purported *explanation* of Insurance Company's alleged conduct.[9] The underlying factual allegation that truly "forms the basis" of Doctor's complaint is, again, simply Insurance Company's alleged failure to abide by its promise to pay out on Doctor's policies – a breach of contract by any other name.

---

[8] The New Jersey consumer protection claim is erroneously labeled as a second "count six," but it is really the seventh count.

[9] For the same reason, Doctor's claim that Insurance Company fraudulently concealed Doctor's cause of action by trying to conceal the contents of the LeBoeuf Report is without merit. The LeBoeuf Report was never the basis of any cause of action asserted by Doctor in this case. It was, at most, a piece of evidence supporting his claims, but those claims were fundamentally based on the allegation that Insurance Company made a promise to pay benefits and then broke that promise. The facts undergirding that alleged cause of action were not in any way "concealed."

To whatever extent these tort claims make out causes of action at all, they are most certainly causes of action that accrued when Doctor received final notice that his policies had been rescinded and no further payments would be made – *i.e.*, upon receipt of the company's March 26, 2001, letter, at the latest. Nothing in the complaint suggests that any discrete event occurred *after* March 26, 2001, that put Doctor on notice of the company's alleged "pattern and practice of fraudulent conduct" or its supposed "secret corporate policy." Nor, indeed, are any actual *facts* related to "fraudulent" or "secret" conduct alleged at all. Doctor is correct that Insurance Company has the burden of proving its affirmative defenses. However, the company cannot defend itself, affirmatively or otherwise, against that which has not been alleged. Doctor simply did not allege any causes of action that accrued, if at all, later than the date his contract claim accrued. Accordingly, we hold that Insurance Company has conclusively established the affirmative defense of untimeliness with regard to all of Doctor's claims, including the "fraud based" ones.

VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Brian E. Harris. This case is remanded to the trial court for collection of costs assessed below, pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE